IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Michael Lee Malone, | ) | C/A No.: 1:15-4878-MGL-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Disability Insurance Benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.    Relevant Background

A.    Procedural History

On August 28, 2009, Plaintiff filed an application for DIB in which he alleged his disability began on February 16, 2009. Tr. at 59 and 106–12.[1] His application was denied initially and upon reconsideration. Tr. at 63–66 and 71–72. On June 16, 2011, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Frederick W. Christian. Tr. at 31–58. The ALJ issued an unfavorable decision on November 10, 2011, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 14–30 and 654–70. The Appeals Council subsequently denied Plaintiff's request for review. Tr. at 1–3, 371–73. Plaintiff filed an action in this court on May 1, 2012, seeking judicial review of the ALJ's decision. *Malone v. Commissioner Social Security Administration*, No. 3:12-1153-GRA, ECF No. 1. On June 14, 2013, the court issued an order reversing the ALJ's decision and remanding the case to the Social Security Administration ("SSA") for further administrative action. Tr. at 680–82. The Appeals Council consequently issued an order remanding the case to an ALJ on August 30, 2013. Tr. at 674–78.

Plaintiff filed a second application for benefits. Tr. at 797–98. On September 23, 2013, the SSA issued a decision finding that Plaintiff became disabled under its rules on February 1, 2013. Tr. at 700–05.

---

[1] The electronic version of the transcript and the bound copy are not identical. Although both copies contain the same number of pages, the bound copy lacks transcripts from the hearings on May 5 and September 9, 2014. All citations to the transcript referenced herein are to its electronic version.

Plaintiff had hearings before ALJ Harold Chambers on May 15, 2014, and September 9, 2014.[2] Tr. at 444–592 and 593–653 (Hr'g Tr.). The ALJ issued an unfavorable decision on February 13, 2015, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 382–443. The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 346–48. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on December 9, 2015. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 42 years old on his alleged onset date and 46 years old on January 31, 2013. Tr. at 635. He completed the eleventh grade. Tr. at 454. His past relevant work ("PRW") was as a construction worker and a machine operator. Tr. at 570. He alleges he has been unable to work since February 16, 2009. Tr. at 106.

2.    Medical History

On February 16, 2009, Plaintiff injured his back while lifting a fire-rated door at a job site. Tr. at 211. Magnetic resonance imaging ("MRI") on March 17, 2009, showed lumbar degenerative disc disease with a diffuse disc bulge and a supraimposed left paracentral disc protrusion that contacted and posteriorly displaced the descending left S1 nerve root. Tr. at 207–208. On March 23, 2009, John M. Hibbitts, M.D. ("Dr. Hibbitts"),

---

[2] ALJ Chambers noted the case was remanded to him to consider whether Plaintiff was disabled from February 16, 2009, through January 31, 2013. Tr. at 597.

observed Plaintiff to have a positive straight-leg raising ("SLR") test on the left, but to ambulate with a normal gait and to have symmetric deep tendon reflexes ("DTRs") and normal range of motion ("ROM") in his hips, knees, and ankles. Tr. at 211. He diagnosed a symptomatic herniated disc and recommended epidural steroid injections ("ESIs") and a rehabilitation program. *Id.* During a follow up visit on April 20, 2009, Plaintiff indicated rehabilitative therapy had provided some relief, but stated he was reluctant to undergo ESIs because a family member had suffered adverse effects from the procedure. *Id.* T. S. Whitehead, PA-C ("Mr. Whitehead"), assured Plaintiff that ESIs were safer than they had been ten years earlier, but agreed to proceed with increased therapy instead. *Id.* On May 4, 2009, Mr. Whitehead indicated the increased physical therapy had aggravated Plaintiff's pain and that he had agreed to receive an ESI. Tr. at 210. Plaintiff reported no symptoms after receiving the ESI. *Id.* Mr. Whitehead released Plaintiff to return to work and specified that Plaintiff could receive ESIs every six weeks as needed. *Id.*

Plaintiff returned to Mr. Whitehead on June 8, 2009, and reported that his left leg discomfort was increasing. *Id.* Mr. Whitehead discussed treatment options, and Plaintiff requested a referral to a surgeon. *Id.*

On July 9, 2009, neurosurgeon Michael N. Bucci, M.D. ("Dr. Bucci"), reviewed Plaintiff's MRI, and noted two small bulging discs at L5–S1 and on the left at L4–5. Tr. at 228. His examination revealed Plaintiff had negative bilateral SLR tests, no sensory loss, normal reflexes, and full muscle strength throughout his body. Tr. at 229. He concluded that surgery was not necessary and referred Plaintiff to Eric P. Loudermilk, M.D. ("Dr. Loudermilk"), a pain specialist. Tr. at 229 and 231.

On August 7, 2009, Plaintiff complained of an intermittent burning pain in his left lower back that radiated to his left foot. Tr. at 233. Dr. Loudermilk's examination showed no significant tenderness, normal SLR test, intact nerves, normal sensation, normal motor strength, normal reflexes, and normal gait. Tr. at 234. Dr. Loudermilk administered a lumbar ESI. Tr. at 232. When Plaintiff returned for a second lumbar ESI on August 20, 2009, he reported little relief from the prior ESI. Tr. at 246. Plaintiff again reported no significant relief on September 1, 2009. Tr. 235. Dr. Loudermilk stated he was skeptical about Plaintiff's radiculopathy because he had not responded well to the ESIs. *Id.* He referred Plaintiff for nerve conduction studies ("NCS") of his left leg. *Id.* On September 28, 2009, Dr. Loudermilk indicated the NCS showed an L5 and an S1 radiculopathy. Tr. at 236. Plaintiff reported a lot of anxiety and trouble sleeping, and Dr. Loudermilk prescribed Klonopin in addition to Lyrica and Lortab. *Id.* He referred Plaintiff for a computed tomography ("CT") myelogram that showed no evidence of nerve root impingement. Tr. at 236, 240, and 252. On October 13, 2009, Dr. Loudermilk performed a lumbar epidural blood patch procedure to treat Plaintiff's post-myelogram spinal headaches. Tr. at 239. He recommended Plaintiff continue to use Lortab and Lyrica for pain, but stated he was not a surgical candidate. Tr. at 240.

On October 27, 2009, state agency medical consultant Hugh Wilson, M.D. ("Dr. Wilson"), reviewed Plaintiff's medical records and completed a physical residual functional capacity ("RFC") assessment. Tr. at 258–65. Dr. Wilson opined that Plaintiff retained the capacity to occasionally lift twenty pounds, frequently lift ten pounds, stand and/or walk about six hours in a workday, and sit about six hours in a workday. Tr. at

259. He indicated Plaintiff's condition limited him to frequent climbing of ramps or stairs; frequent balancing; occasional stooping, kneeling, crouching, and crawling; and precluded him from climbing ladders, ropes, or scaffolds. Tr. at 260.

On November 25, 2009, Dr. Loudermilk prescribed Paxil for depression. Tr. at 278. He indicated Plaintiff was suffering from chronic mechanical low back pain of unclear etiology with mild lumbar disc bulging and disc protrusions and without evidence of nerve root compression. *Id.* He stated Plaintiff needed to complete a work hardening program and return to some type of gainful employment. *Id.* On January 19, 2010, Dr. Loudermilk opined that Plaintiff was at maximum medical improvement and should be able to return to gainful employment. Tr. at 276. He noted Plaintiff was having some problems with depression and increased his dosage of Paxil. *Id.*

In approximately February 2010, Plaintiff underwent a functional capacity evaluation ("FCE").[3] Plaintiff's physicians noted that the FCE report indicated Plaintiff did not give his full effort. *See* Tr. at 270 and 275. Dr. Loudermilk wrote there were multiple inconsistencies that would suggest Plaintiff may have been able to perform at a greater physical capacity than he was exhibiting. Tr. at 275.

On March 16, 2010, Plaintiff indicated to Dr. Loudermilk that he had recently sustained a fall after his "back went out." Tr. at 274. Plaintiff stated he felt like something was "slipping" in his lumbar spine. *Id.* Dr. Loudermilk indicated he would refer Plaintiff for flexion and extension x-rays to determine if there was something "slipping." *Id.* He stated Plaintiff needed to work toward closing his Workers' Compensation case and

---

[3] The FCE is not included in the record.

returning to a status of gainful employment. *Id.* Flexion and extension view x-rays showed no abnormal motion segment. Tr. at 282. Lumbar spine imaging indicated degenerative disc space narrowing posteriorly at L4–L5 and L5–S1. Tr. 282.

On March 29, 2010, Plaintiff presented to Carol W. Burnette, M.D. ("Dr. Burnette"), for an evaluation of his impairment rating. Tr. at 270–73. Dr. Burnette indicated Plaintiff walked with a slightly antalgic gait and had some increased muscle tension and a restricted ROM in his lumbar spine. Tr. at 272. A neurological examination revealed an altered sensation in Plaintiff's left posterolateral leg and foot, but Plaintiff had normal tone and motor strength. *Id.* Dr. Burnette assessed impairment ratings of 16 percent to Plaintiff's lumbar spine and 12 percent to his whole person. Tr. at 273. She recommended permanent work restrictions that included no lifting greater than 30 pounds occasionally, no repetitive bending or twisting, and no prolonged sitting or standing without the ability to change positions at will. *Id.*

On April 13, 2010, Dr. Loudermilk noted that Plaintiff tolerated Xolox, Klonopin, Lyrica, and Paxil without side effects. Tr. at 269. He assessed mild lumbar disc bulging without obvious nerve root compression. *Id.*

On May 17, 2010, Dr. Loudermilk indicated in a mental status form that Plaintiff was oriented to time, person, place, and situation; had an intact thought process; had obsessive thought content; had a worried/anxious mood/affect; had adequate attention and concentration; had adequate memory; and exhibited slight work-related limitation in function due to a mental condition. Tr. at 284.

On May 28, 2010, state agency consultant Craig Horn, Ph. D. ("Dr. Horn"), opined that depression and anxiety caused only mild difficulties in Plaintiff's abilities to maintain social functioning and concentration, persistence, or pace. Tr. at 287–300. On June 10, 2010, state agency medical consultant Dale Van Slooten, M.D. ("Dr. Van Slooten"), assessed the same limitations as Dr. Wilson. Tr. at 301–08. Dr. Van Slooten specifically noted that Plaintiff's alleged limitations in standing, sitting, and walking were not supported by the evidence and that his allegations of severe pain were not supported by MRI results or physical examinations. Tr. at 306.

Plaintiff reported symptoms of depression and crying spells to Dr. Loudermilk in September 2010. Tr. at 319.

On October 1, 2010, chiropractor Donald Worley, D.C., stated he had treated Plaintiff since August 16, 2010, and noted he walked with an antalgic gait, demonstrated decreased ROM, and had severe muscle spasms to palpation. Tr. at 313.

Plaintiff presented to psychiatrist Geera Desai, M.D. ("Dr. Desai"), in October and November 2010. *See* Tr. at 309–312. On October 28, 2010, Plaintiff stated he was unable to lift his infant son and did not want to be around anyone. Tr. at 312. He reported that his mind wandered and that he suffered from crying spells and had difficulty sleeping. Tr. at 310. Dr. Desai prescribed Xolox and Pristiq. *Id.* On November 29, 2010, Plaintiff indicated he felt tired and aggravated and did not want to be around people. *Id.*

Plaintiff reported increased neck pain and bilateral upper extremity numbness to Sherri Cheek, APRN ("Ms. Cheek"), on October 8, 2010. Tr. at 318.

On October 28, 2010, Plaintiff reported depression, poor sleep, crying spells, stomach upset, poor memory, and poor concentration. Tr. at 924. He stated he could not sit for more than 30 minutes; lift more than 30 pounds; engage in prolonged walking; bend over; or take a bath. Tr. at 925. Dr. Desai observed Plaintiff to be alert and oriented, but to constantly pace the floor and to have poor eye contact. *Id.* She noted he made facial grimaces that suggested he was in pain and appeared to be depressed and somaticizing. *Id.* She increased Pristiq to 100 milligrams and prescribed 100 milligrams of Desyrel. *Id.*

On November 5, 2010, Ms. Cheek indicated an MRI of Plaintiff's cervical spine revealed some arthritis with an annular bulge from C3-4 through C5-6, with straightening of the cervical curve. Tr. at 317. She stated she felt like "a lot of" Plaintiff's "pain was coming from depression." *Id.*

On November 29, 2010, Plaintiff indicated Desyrel was helping him to sleep, but stated his pain was sometimes strong enough to wake him. Tr. at 923. He indicated Trazodone caused him to feel dizzy and sleepy the next day. *Id.* He complained of feeling worn out, tired, aggravated, and depressed. *Id.* He indicated he was avoiding others. *Id.*

Plaintiff reported some improvement with the addition of Skelaxin on December 3, 2010, but indicated the medication made him drowsy. Tr. at 316. Ms. Cheek stated Plaintiff's medications were effectively treating his pain. *Id.*

On December 22, 2010, Plaintiff reported he was on edge and mad at the world. Tr. at 922. He complained of depression and agitation. *Id.* Dr. Desai recommended Plaintiff speak to Dr. Loudermilk about increasing his dosage of Klonopin. *Id.*

9

On January 4, 2011, Dr. Loudermilk stated Plaintiff continued to suffer from chronic mechanical low back pain and left leg pain, as well as anger and mood lability. Tr. at 315. He arranged for Plaintiff to be fitted with a muscle stimulator unit. *Id.*

On January 19, 2011, Plaintiff reported improvement with the increased dose of Klonopin. Tr. at 921. He endorsed difficulty sleeping at night, but stated he only took half of a Trazodone because it made him extremely sleepy, irritable, tired, and angry. *Id.* Dr. Desai observed Plaintiff to be frustrated, depressed, and somaticizing. *Id.*

On February 1, 2011, Dr. Loudermilk indicated Plaintiff had fallen and injured his right calf and foot. Tr. at 314.

On March 17, 2011, Plaintiff complained that he was experiencing significant pain, feeling stressed, and having difficulty sleeping. Tr. at 920. Dr. Desai completed a mental RFC form and specified multiple limitations and restrictions. Tr. at 324–26.

Plaintiff reported increased pain on April 29, 2011. Tr. at 955. He stated Xolox was only controlling his pain for four to five hours instead of six hours at a time. *Id.* Ms. Cheek prescribed Ultram for Plaintiff to take in between his doses of Xolox. *Id.*

On May 3, 2011, Plaintiff reported he was in pain and had difficulty ambulating. Tr. at 920. Dr. Desai indicated Plaintiff was depressed and could not concentrate or enjoy day-to-day life. *Id.*

On May 27, 2011, Plaintiff indicated his medications were working well and he was tolerating them without side effects. Tr. at 954. He complained of left-sided headaches, but Dr. Loudermilk indicated he did not feel the headaches were related to the back pain. *Id.*

On June 14, 2011, Plaintiff complained to Dr. Desai of excessive daily low back pain and an inability to sleep. Tr. at 919.

Plaintiff presented to Ron O. Thompson, Ph. D. ("Dr. Thompson"), for a consultative examination on July 11, 2011. Tr. at 339–41. Dr. Thompson performed several tests of mental and psychological functioning. *Id.* He noted that Plaintiff's speech was normal and coherent, but that Plaintiff appeared to have poor stress-coping skills, was easily distracted, and had delayed cognitive processing. Tr. at 339. Dr. Thompson estimated Plaintiff had low borderline intellectual functioning. *Id.* However, his intelligence quotient ("IQ") testing fell in the mild range of mental deficiency. Tr. at 340. Dr. Thompson noted Plaintiff appeared to score far below what would be expected of one who had performed his past work for a number of years. *Id.* He attributed the inconsistency to Plaintiff's poor psychological adjustment to his physical allegations. Tr. at 341. Dr. Thompson noted that Plaintiff's complaints of pain were extraordinary and histrionic and that his psychiatric symptoms appeared to be quite pronounced and related to anxiety and preoccupation with pain. *Id.* Dr. Thompson opined that Plaintiff could not possibly concentrate on simple, repetitive types of tasks without being involved in a dangerous situation. *Id.* He indicated Plaintiff would have extreme restrictions responding to work pressures and marked restrictions in his ability to interact appropriately with the public, supervisors, and coworkers in a usual work setting. Tr. at 342–44.

On July 12, 2011, Plaintiff presented to neurologist Russell Rowland, M.D. ("Dr. Rowland"), for a consultative examination. Tr. at 327–31. He reported low back pain, daily headaches, and depression. Tr. at 328. Plaintiff had no muscle atrophy and full

strength in all of his extremities. Tr. at 329–30. Plaintiff demonstrated limited ROM of his hips and knees, but Dr. Rowland did not believe he was putting forth full effort. Tr. at 330. SLR tests were negative. *Id.* Dr. Rowland concluded that Plaintiff's symptoms far outweighed the physical findings and the results of the MRI of his lumbar spine. Tr. at 331. He stated there appeared to be "a lot of emotional overlay with his pain." *Id.* He opined that Plaintiff could continuously lift 21 to 50 pounds; sit for an hour at a time; stand for 30 minutes at a time; walk for 10 minutes at a time; sit for six hours in an 8-hour workday; stand for six hours in an eight-hour workday; walk for four hours in an eight-hour workday; continuously reach, handle, finger, feel, push, and pull; frequently climb ramps and stairs; occasionally stoop, kneel, crouch, and crawl; and never balance, climb ladders or scaffolds, or be exposed to unprotected heights or dangerous, moving machinery. Tr. at 332–37.

On September 16, 2011, Plaintiff indicated to Meredith Purgason, APRN ("Ms. Purgason"), that the injections administered during the last visit had relieved his wrist pain. Tr. at 950. He denied side effects from his medications, but stated Tramadol was not effectively controlling his pain. *Id.* Ms. Purgason suggested adding a prescription for a Butrans patch, but Plaintiff instead agreed to continue taking the same medications. *Id.*

On November 16, 2011, Plaintiff reported he was experiencing increased stress, irritability, and mood swings. Tr. at 880. He questioned whether these symptoms may be side effects of his pain medication. *Id.* Ms. Purgason indicated to Plaintiff that his increased irritability was likely the result of increased stress and depression. *Id.*

On January 20, March 15, and May 10, 2012, Ms. Purgason indicated Plaintiff was compliant with his medications; denied adverse side effects; and stated his medications kept his pain at a tolerable level. Tr. at 877, 878, and 879.

On May 15, 2012, Plaintiff indicated to Dr. Desai that he had difficulty driving long distances and was sleeping for half the day. Tr. at 890. He expressed sadness over his inability to participate in activities. *Id.*

On June 28, 2012, Plaintiff complained of a flare up of low back pain that was radiating down his left leg and to his inner left thigh. Tr. at 876. He stated his medications provided some relief and indicated he was tolerating them without adverse effects. *Id.* Ms. Purgason prescribed a Medrol Dosepak and refilled Plaintiff's other medications. *Id.*

On August 13, 2012, Plaintiff indicated to Dr. Desai that he was significantly limited by his pain and was unable to spend quality time with his children. Tr. at 891.

On October 19, 2012, Plaintiff reported pain in his back and left leg and endorsed numbness and tingling in his arms and hands d. Tr. at 874. Dr. Loudermilk referred Plaintiff for a cervical MRI, discontinued Xolox, prescribed Mobic and Roxicodone, and provided information on spinal cord stimulation. *Id.* The MRI of Plaintiff's cervical spine showed generalized cervical spondylosis, multilevel disc bulging, and osteophyte formation with varying degrees of central canal stenosis and neural foraminal impingement. Tr. at 882–83.

Dr. Desai indicated Plaintiff was continuing to do well on Pristiq, voiced no concerns or complaints, and was mentally stable on November 7, 2012. Tr. at 891.

On November 16, 2012, Plaintiff indicated a desire to proceed with a trial of a spinal cord stimulator to help reduce the pain in his back and left leg. Tr. at 873. Dr. Loudermilk noted that Plaintiff's cervical MRI showed multilevel cervical spondylosis with disc bulging and spurs, but did not suggest a need for surgery. *Id.* He discontinued Mobic based on Plaintiff's report of adverse side effects. *Id.*

On December 14, 2012, Plaintiff indicated to Dr. Loudermilk that he was experiencing pain in his bilateral thumbs. Tr. at 866. Dr. Loudermilk administered a Cortisone injection at the base of Plaintiff's right thumb and referred him to a hand surgeon. *Id.* Plaintiff expressed a desire to hold off on implantation of a spinal cord stimulator because he had met his insurance deductible, but Dr. Loudermilk could not guarantee him that the procedure would be performed by the end of the year. *Id.*

Plaintiff presented to L. Edwin Rudisill, Jr., M.D. ("Dr. Rudisill"), with a complaint of severe left thumb pain. Tr. at 862–63. Dr. Rudisill diagnosed left trigger thumb and administered an injection. *Id.* When Plaintiff returned to Dr. Rudisill on March 19, 2013, he reported temporary relief as a result of the prior injection, but stated his thumb was catching again. Tr. at 863. Dr. Rudisill administered a second injection. *Id.*

On January 11, 2013, Plaintiff reported severe pain in his neck, back, and lower extremities and stated he was out of medication. Tr. at 871. Ms. Purgason authorized refills. *Id.*

Plaintiff reported increased depression and inability to sleep to Dr. Desai on February 6, 2013. Tr. at 889. He noted his mind was racing during the night. *Id.* Dr. Desai prescribed 100 milligrams of Pristiq and 100 milligrams of Trazodone. *Id.*

On February 8, 2013, Plaintiff complained of a severe flare up of low back and left leg pain. Tr. at 870. Ms. Purgason prescribed a Medrol Dosepak and referred Plaintiff for an MRI of his lumbar spine. *Id.*

The MRI of Plaintiff's lumbar spine showed a left-sided L4-5 disc protrusion with a small disc fragment that migrated inferior to the disc along the anterior aspect of the left L5 transverse root and may produce radiculopathy; a mild left-sided L5-S1 disc protrusion with a deep annular tear; a right-side predominant disc bulge at L3-4; and discogenic edema of the L4-5 and L5-S1 endplates. Tr. at 881.

Plaintiff followed up with Ms. Purgason on March 1, 2013, to discuss the results of his MRI. Tr. at 869. She stated Plaintiff received some relief of his symptoms through use of Roxicodone, Ultram, and Klonopin and noted that he was tolerating the medications without adverse effects. *Id.* Ms. Purgason indicated she would consult with Dr. Loudermilk. *Id.* Dr. Loudermilk administered lumbar ESIs on March 15, March 28, and April 18, 2013. Tr. at 868 and 884–86.

On April 9, 2013, Plaintiff presented to Michael Reing, M.D. ("Dr. Reing"), for a surgical consultation. Tr. at 892. Dr. Reing observed Plaintiff to have point tenderness and decreased sensation in his lateral left thigh, but to have normal motor function, feeling, and DTRs. Tr. at 893. He recommended surgery. *Id.* On April 22, 2013, Dr. Reing performed left hemilaminectomy and discectomy. Tr. at 897–99.

Plaintiff presented to Dr. Thompson for a second consultative examination on July 17, 2013. Tr. at 910–13. Dr. Thompson indicated Plaintiff looked to be in pain and was quite sluggish. Tr. at 910. He described Plaintiff's mood as irritable and depressed and

indicated his affect was sad and tearful. *Id.* He noted Plaintiff was able to follow a two-step instruction and had fair insight and judgment. *Id.* He stated Plaintiff had intact recent and remote memory, but poor attention and concentration. *Id.* Dr. Thompson indicated Plaintiff "seems to have made a very poor psychological adjustment to his pain and current difficulties." Tr. at 911. Plaintiff reported problems with withdrawal, anhedonia, and daily crying spells. *Id.* Dr. Thompson indicated "[a]s he presents today, I believe he would not be able to perceive or avoid danger in a typical work place and he seems to have difficulty with emotional control." *Id.* He concluded as follows:

> This gentleman seems to have emotionally gone downhill and has sunk deeper into depression than the last time I saw him according to my previous notes and report on him. I do not believe he is capable of managing benefits currently due to the neurovegetative symptoms of major depression, poor concentration and attention, and certainly do not believe he could be trusted to work independently in a typical work environment without coming into contact with machinery or becoming at risk for another injury as he presents on this occasion.

Tr. at 912.

At the ALJ's request, Plaintiff presented to John C. Whitley, III, Ph. D. ("Dr. Whitley"), for a psychological evaluation on July 22, 2014. Tr. at 974–80. Plaintiff reported struggling with memory and concentration throughout his life, but indicated his pain exacerbated his memory and concentration problems. Tr. at 975. He stated his back pain caused him to feel sad and depressed and to avoid others. *Id.* He indicated he cried easily, had limited energy, and had little motivation. *Id.* Dr. Whitley observed that Plaintiff "appeared to be in significant pain"; was very restless in his seat; and had to stand several times during the interview because of pain. Tr. at 977. He noted Plaintiff

16

was sad and frustrated. *Id.* Plaintiff had grossly intact recent and remote memory; was able to recall four of four objects immediately and two of four objects after a 15-minute delay; was able to recite three digits forwards and backwards and spell "world" forwards and backwards; performed serial threes, fives, and sevens in a forward manner; interpreted proverbs; understood conversational speech; discussed a current event; and performed simple subtraction. *Id.* Dr. Whitley observed Plaintiff to have a mildly slow, but coherent and organized thought process. *Id.* He indicated Plaintiff's thoughts were sometimes interrupted by pain. *Id.* He indicated Plaintiff was cooperative and responsive; put forth effort during the interview; and did not attempt to embellish his symptoms. *Id.* He stated Plaintiff's IQ scores, which ranged from 72 to 81, and other testing, which showed him to be reading on a third grade level and performing math on a fifth grade level, were "felt to be a mild underestimation of his true functioning abilities," but "appeared to represent his current difficulties." Tr. at 978–79. He diagnosed depressive disorder due to chronic back pain with depressive features, adjustment disorder with mixed anxiety and depressive mood, and borderline intellectual functioning. Tr. at 979. Dr. Whitley stated Plaintiff did not meet qualifications for mental retardation. Tr. at 980.

      C.     The Administrative Proceedings

          1.     The Administrative Hearing

              a.     Plaintiff's Testimony

                  i.     June 16, 2011

Plaintiff testified that he attended special education classes and was unable to read or write. Tr. at 36. He stated he worked in the construction industry as a carpenter's

helper, a plumber's helper, and an electrician's helper; operated heavy equipment; and loaded and unloaded rolls of plastic in a factory setting. Tr. at 36–37.

Plaintiff testified he stopped working on February 16, 2009, after injuring his back. Tr. at 38–39. He indicated he experienced severe back pain that radiated through his legs and caused throbbing, tingling, and stabbing sensations. Tr. at 39 and 45. He endorsed severe headaches and numbness and tingling in his arms. Tr. 39–40 and 43. Plaintiff testified he had difficulty maintaining his balance and had sustained falls. Tr. at 40.  He stated he used a cane and a wheeled walker to balance and alternate from sitting to standing and vice versa. Tr. at 40 and 42. He indicated he was seeing a psychiatrist for emotional problems that were often manifested by anger, sadness, and crying. Tr. at 44.

Plaintiff reported that he could not sit and stand comfortably for more than a short period of time. Tr. at 42. He testified he was very emotional because of his inability to participate in activities with his children. Tr. 44. He stated he used to play golf, go fishing and hunting, and play with his children. *Id.* He endorsed side effects from his medications that included dizziness, lightheadedness, and drowsiness. Tr. at 45–46.

Plaintiff stated he was able to care for his personal needs without assistance. Tr. at 47. He indicated he occupied his time by walking around, watching television, and lying down during the day. *Id.* He testified he saw a chiropractor three times a week. Tr. at 49.

ii.    May 15, 2014

Plaintiff testified he experienced sharp pain in his low back that radiated through his legs and caused numbness. Tr. at 612. He stated that, following his injury in February 2009, he filed a Workers' Compensation claim and was referred to doctors. Tr. at 601–

02. He indicated a Workers' Compensation doctor authorized him to return to work on light duty, but he was unable to complete the workday. Tr. at 603. He stated he attempted physical therapy, but it increased his pain. Tr. at 604. He indicated he underwent back surgery in April 2013. Tr. at 606.

Plaintiff testified his pain typically ranged between a seven and an eight on a 10-point scale and was aggravated by turning the wrong way, exiting a car, sitting, and other activities. Tr. at 613. He stated his pain disrupted his sleep. *Id.* He testified his ability to walk varied from day to day. Tr. at 614. He stated he could sometimes lift 10 to 20 pounds, but other times had difficulty performing any lifting. Tr. at 615. He indicated he had difficulty bending to pick up items from the floor. *Id.*

Plaintiff endorsed little change in his pain since undergoing the surgery in February 2013. Tr. at 618. He stated the pain that was radiating to his groin had disappeared, but indicated he continued to experience pain through his legs. *Id.*

Plaintiff testified he received psychiatric treatment from Dr. Desai. Tr. at 617–18. He stated he felt helpless and was unable to care for his children. *Id.* He indicated he developed marital problems that resulted in divorce. Tr. at 618. He testified he had enjoyed hunting, fishing, golfing, and playing church-league softball, but was no longer able to engage in those activities. Tr. at 625–26, 632. He stated he had been living with his parents for a year-and-a-half. Tr. at 633. He indicated he spent most days watching television, talking to his parents, and walking around the yard. Tr. at 633–34. He stated he was able to care for most of his personal needs, but sometimes required help to put on his shoes and socks. Tr. at 634.

Plaintiff testified he was enrolled in special education classes while in school. Tr. at 620. He stated he had difficulty reading, writing, performing mathematical operations, and learning material. *Id.* He denied the ability to read a newspaper or letter. *Id.*

### iii.    September 9, 2014

Plaintiff testified he was in basic or special classes when he was in school. Tr. 454–55. He stated he was expelled after getting into a fight. Tr. at 457–58.

Plaintiff reported he injured his back while lifting a fire-rated door. Tr. at 466. He stated his back went out and he fell to the floor. *Id.* He indicated he asked Dr. Hibbitts to allow him to return to work during the summer of 2009, but left work permanently in September 2009, when he was unable to perform light duty work. Tr. at 467–68.

Plaintiff testified he experienced pain in his back and legs. Tr. at 471. He indicated he initially experienced pain in his left leg, but had begun to notice pain in both legs in 2013. *Id.* He stated he underwent a discectomy in April 2013. Tr. at 472–73.

Plaintiff testified that he had been using a cane since he was injured. Tr. at 474. He stated he often fell. *Id.* He indicated his cane was not prescribed. Tr. at 475.

Plaintiff indicated he continued to treat with Dr. Loudermilk. Tr. at 475. He stated Dr. Loudermilk had provided therapy, injections, and medications. Tr. at 475–77. He indicated his medications caused drowsiness and were sometimes ineffective. Tr. at 477.

Plaintiff testified he was unable to participate in activities with his children, but visited athletic facilities to watch his son play sports. Tr. at 481–82. He stated he had been divorced for approximately two years and that his children lived with his wife. Tr. at

483. He indicated he had a driver's license and was able to drive. Tr. at 484. He denied visiting with friends. Tr. at 501–04.

Plaintiff testified his ability to sit varied, but he estimated he typically sat for 20 to 30 minutes at a time. Tr. at 491. He estimated he could stand for 15 to 20 minutes and walk for 30 minutes. Tr. at 492. He indicated he felt unbalanced when he attempted to bend. Tr. at 494. He stated a gallon of milk was likely the heaviest item he lifted. Tr. at 498. He indicated he took naps approximately twice a week. Tr. at 504.

Plaintiff testified he experienced crying spells on most days. Tr. at 507. He endorsed problems with anger, withdrawal, and anxiety. Tr. at 508.

b.    Vocational Expert Testimony

i.    June 16, 2011

Vocational Expert ("VE") Carey A. Washington reviewed the record and testified at the hearing. Tr. at 50–57. The VE categorized Plaintiff's PRW as a carpenter, *Dictionary of Occupational Titles* ("*DOT*") number 860.381-022, as medium in exertional level with a specific vocational preparation ("SVP") of seven; a heavy equipment operator, *DOT* number 859.683-010, as medium with an SVP of six; and a machine packager, *DOT* number 920.685-078, as medium and unskilled. Tr. at 51. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could lift one to two pounds frequently and no more than 10 pounds occasionally; could engage in no prolonged sitting, standing, or walking; and must be able to alternate positions between sitting, standing, and walking at the workstation at will; could not work at heights or around hazardous machinery; could do no climbing or balancing; could not

operate automotive or automotive-type equipment; and could perform no repetitive bending or twisting. Tr. at 51–52. The VE testified the hypothetical individual would be unable to perform Plaintiff's PRW. Tr. at 52. The ALJ asked whether there were any other jobs in the regional or national economy that the hypothetical person could perform using previously-acquired vocational skills. *Id.* The VE identified light jobs with an SVP of three as an order filler, *DOT* number 222.487-014, with 3,000 to 4,000 positions in South Carolina and 175,000 to 200,000 positions in the national economy and a general clerk or office clerk, *DOT* number 209.562-010, with 6,000 to 8,000 positions in South Carolina and 150,000 to 175,000 positions in the national economy. *Id.* The ALJ asked which skills from Plaintiff's PRW would be transferable to the identified jobs. Tr. at 53. The VE testified Plaintiff's measuring and record-keeping skills would be transferable. *Id.* The ALJ asked the VE to identify unskilled jobs that could be performed. *Id.* The VE identified light and unskilled jobs as a linen grader, *DOT* number 361.687-022, with 3,000 to 4,000 positions in South Carolina and 50,000 to 75,000 positions in the national economy and a ticket seller, *DOT* number 211.467-030, with 4,000 to 6,000 positions in South Carolina and 100,000 to 125,000 positions in the national economy. *Id.*

The ALJ reminded the VE that he had specified in his hypothetical question that the individual would be able to lift no more than 10 pounds occasionally and one to two pounds frequently. Tr. at 53. He asked if the light jobs identified by the VE would require the individual lift more than 10 pounds. *Id.* The VE testified the jobs would not. *Id.* The ALJ acknowledged that the *DOT* did not address the sit-stand option and asked the VE to

explain the basis of his response. *Id.* The VE explained that his conclusion was based on his observation of the type of work he identified. Tr. at 54.

The ALJ next asked the VE to assume the individual would have no useful ability to function in a predictable manner, to deal with the public, or to function independently. *Id.* He asked what effect the additional limitations would have on the jobs identified in response to the first hypothetical question. *Id.* The VE responded that the additional limitations would preclude work as a ticket seller, but not as a linen grader, order filler, or general clerk. *Id.*

The ALJ asked the VE to assume that, as a result of pain, the individual's ability to concentrate was impaired to the extent that he could not complete even simple tasks on a sustained basis throughout a two-hour period, eight-hour workday, or 40-hour workweek. Tr. at 54. He asked the VE to explain the effect such a limitation would have on the individual's ability to perform the jobs previously identified. Tr. at 55. The VE responded it would preclude all work activity. *Id.*

Plaintiff's counsel asked the VE to assume the hypothetical individual was functionally illiterate and asked if he would have difficulty performing the jobs of order filler and general clerk. Tr. at 57. The VE stated it would be difficult for a functionally illiterate individual to perform the jobs on a sustained basis. *Id.*

ii.     May 15, 2014

VE Robert E. Brabham, Sr., reviewed the record and testified at the hearing. Tr. at 621–23 and 635–44. He identified Plaintiff's PRW as a material handler, *DOT* number 929.687-030, as heavy with an SVP of three and a construction worker I, *DOT* number

869.664-014, as heavy with an SVP of four. Tr. at 623. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could lift and carry up to 15 pounds occasionally and up to 10 pounds frequently; could stand and walk for up to 30 minutes at a time and for up to four hours in an eight-hour workday; could sit for up to 45 minutes at a time and for four to six hours in an eight-hour workday; would have the option to alternate sitting and standing at the work station; would be off task for no more than five percent of the work period; could frequently balance and push/pull with the bilateral upper extremities; could occasionally operate foot controls with the bilateral lower extremities; could not climb ladders/ropes/scaffolds, crouch, kneel, or crawl; could occasionally climb ramps and stairs; could engage in no repetitive rotation, flexion, or extension of the neck; should avoid concentrated exposure to excessive vibration; should avoid even moderate exposure to hazards, such as moving machinery and unprotected heights; could perform only simple, routine, and repetitive tasks in an environment that was free of fast-paced production requirements; could handle few, if any, changes in the workplace; and could occasionally interact with coworkers. Tr. at 635–37. The VE confirmed that the hypothetical individual would be unable to perform Plaintiff's PRW. Tr. at 638. The ALJ asked the VE to identify other jobs in the regional or national economy that the hypothetical individual could perform. *Id.* The VE identified light jobs with an SVP of two as an assembler, *DOT* number 739.687-078, with 360,000 positions in the national economy; a packer, *DOT* number 753.689-038, with 400,000 positions in the national economy; and a machine tender, *DOT* number 689.685-130, with 400,000 positions in the national economy. Tr. at 638–39.

24

For a second hypothetical question, the ALJ asked the VE to assume the individual could lift and carry up to 10 pounds occasionally and less than 10 pounds frequently; could stand and walk for two to four hours in an eight-hour workday; could sit for up to six hours during an eight hour workday; and would have the same additional limitations set forth in the first hypothetical question. Tr. at 639–40. He asked the VE to identify jobs in the regional or national economy that the hypothetical individual could perform. Tr. at 640. The VE identified sedentary jobs with an SVP of two as an assembler, *DOT* number 732.684-062, with 80,000 positions in the national economy; a packer, *DOT* number 589.687-014, with 200,000 positions in the national economy; and a surveillance monitor, *DOT* number 379.367-010, with 40,000 positions in the national economy. Tr. at 640–41.

For a third hypothetical question, the ALJ asked the VE to assume the hypothetical individual would be unable to sustain concentration, persistence, or pace to perform even simple, routine, repetitive tasks over the course of an eight-hour day and five-day, 40-hour workweek; would have to take more than three breaks per day; and would need to lie down throughout the course of the workday. Tr. at 642. The VE stated the limitations would preclude employment. *Id.*

### iii.    September 9, 2014

VE Robert E. Brabham, Sr., reviewed the record and testified at the supplemental hearing. Tr. at 567–87. He identified Plaintiff's PRW as a construction worker I, *DOT* number 869.664-014, as requiring heavy exertion and having an SVP of four and a machine operator II, *DOT* number 619.685-062, as requiring medium exertion and having

an SVP of three. Tr. at 570. The ALJ described a hypothetical individual of Plaintiff's

vocational profile who could lift 20 to 25 pounds occasionally and 10 pounds frequently

from mid-thigh to tabletop level only; could stand and walk for up to four hours in an

eight-hour workday; could sit for four to six hours in an eight-hour workday; could

exercise a sit-stand option at the work station without being off-task for more than five

percent of the work period;  could sit for 45 to 60 minutes at a time; could stand for up to

30 minutes at a time; could walk for 20 to 30 minutes at a time; could operate foot

controls to lift up to 20 pounds occasionally and 10 pounds frequently with the right foot

and 10 pounds occasionally and less than 10 pounds frequently with the left foot; could

not crouch or climb ladders, ropes, or scaffolds; could occasionally climb ramps and

stairs, stoop, kneel, and crawl; could frequently balance; should avoid even moderate

exposure to excessive vibration; should avoid all exposure to hazards, such as moving

machinery and unprotected heights; was limited to the performance of simple, routine,

and repetitive tasks in a work environment free of production requirements; could make

only simple work-related decisions; could handle few, if any, changes in the work place;

would require that changes be introduced on a gradual basis; could interact minimally

with the general public; and could work around others, but should only be required to

interact with coworkers on an occasional basis. Tr. at 571–73. The VE indicated an

individual with the limitations set forth in the hypothetical question would be unable to

perform Plaintiff's PRW. Tr. at 574. The ALJ asked the VE to identify other jobs in the

regional or national economy that the hypothetical individual could perform. *Id.* The VE

identified light jobs with an SVP of two as an assembler, *DOT* number 739.687-078, with

26

360,000 positions in the national economy; a packer, *DOT* number 753.687-038, with 400,000 positions in the national economy; and a production inspector, *DOT* number 669.687-014, with 200,000 positions in the national economy. Tr. at 574–76.

For a second hypothetical question, the ALJ asked the VE to assume the hypothetical individual had the same exertional limitations specified in the first hypothetical question, but to further assume the individual would require a hand-held assistive device for use on uneven terrain and when walking for more than an hour. Tr. at 576. He asked if the individual would still be able to perform the jobs identified in response to the first hypothetical question. *Id.* The VE stated the additional limitation would not affect an individual's ability to perform the jobs identified in response to the first hypothetical question. Tr. at 577.

For a third hypothetical question, the ALJ asked the VE to assume the same limitations indicated in the last question, but to further assume the individual was limited to lifting and carrying up to 10 pounds occasionally and less than 10 pounds frequently and could stand and/or walk for two to four hours during an eight-hour workday. *Id.* He asked the VE to identify jobs an individual with the specified limitations could perform. *Id.* The ALJ indicated the individual could perform sedentary jobs with an SVP of two as an assembler, *DOT* number 739.687-086, with 80,000 positions in the national economy; a hand packer, *DOT* number 589.687-014, with 200,000 positions in the national economy; and a label cutter, *DOT* number 585.685-062, with 40,000 positions in the national economy. Tr. at 578–79.

For a fourth hypothetical question, the ALJ asked the VE to assume the individual would be unable to perform simple, routine, and repetitive tasks on a regular and sustained basis for eight hours a day, five days a week, and 40 hours per workweek. Tr. at 579. The VE indicated the limitations would preclude all competitive employment. *Id.* He stated most employers would tolerate one absence per month and would expect an employee to work for two hours at a time before taking a 15-minute break. Tr. at 580–81.

Plaintiff's attorney asked the VE to assume the individual would need to alternate between sitting and standing every 20 minutes. Tr. at 583. He asked if the individual would be able to perform the jobs that were identified in response to the ALJ's hypothetical questions. *Id.* The VE stated the jobs would not be affected. Tr. at 583–84.

Plaintiff's attorney asked the VE to assume the individual would be off task for one hour in addition to normal break periods. Tr. at 586. The VE stated the additional limitation would not allow for performance of work. Tr. at 586–87. Plaintiff's attorney asked if jobs as an inspector and an assembler required fairly constant attention to the task. Tr. at 587. The VE indicated they did. *Id.*

c.      Medical Expert Testimony

i.      September 9, 2014

a.      Dr. Schosheim

Medical Expert Peter Schosheim, M.D. ("Dr. Schosheim"), testified he no longer maintained an active medical practice. Tr. at 518. He stated that 40 percent of his business derived work as a medical expert for the Social Security Administration and the other 60 percent of his work was performed as a medical cost consultant for attorneys and

insurance companies. Tr. at 518–19. He indicated he worked from 1983 to 2003 as an orthopedist in Boca Raton, Florida. Tr. at 524.

Dr. Schosheim testified that Plaintiff's impairment did not meet Listing 1.02 because the record did not suggest he was prescribed a cane or was unable to ambulate effectively. Tr. at 525. Although he stated the records from 2009 showed Plaintiff to have a truncated nucleus pulposis with radiculopathy, he noted that Plaintiff's impairment failed to meet Listing 1.04 because the record contained no evidence of sensory or reflex changes, strength deficits, or atrophy.[4] Tr. at 527. Dr. Schosheim indicated Plaintiff had an impinged and displaced nerve root at L5-S1 from the time of his injury in 2009, but that the 2013 MRI showed that a disc fragment became displaced and lodged in the neural canal. Tr. at 529. He stated Dr. Loudermilk's and Dr. Burnette's findings were consistent with radiculopathy involving the S1 nerve root. *Id.* He opined that between February 6, 2009, and January 31, 2013, Plaintiff had the RFC to occasionally lift, carry, push, and pull 20 pounds; to frequently lift, carry, push, and pull 10 pounds; to stand and/or walk for two hours during an eight-hour workday; to sit for a total of six hours during an eight-hour workday; to alternate from sitting to standing for a few minutes every half hour at the work station; to occasionally climb ramps or stairs, kneel, crouch, crawl, and stoop; to occasionally operate foot controls and balance with his left leg; and to frequently balance and operate foot controls with his right leg. Tr. at 530–32. Plaintiff would have been unable to climb ladders, ropes, or scaffolds and should have avoided all

---

[4] Dr. Schosheim later clarified that Dr. Loudermilk's records showed Plaintiff to have sensory deficits during some office visit, but not during other visits. Tr. at 536–37.

exposure to hazardous machinery, unprotected heights, and heavy vibration. Tr. at 531. Dr. Schosheim indicated he considered Plaintiff's pain in assessing his RFC. Tr. at 538. However, he later stated that he did not consider whether Plaintiff's pain would cause him to be distracted. Tr. at 540. He indicated he did not consider the side effects of Plaintiff's medications because the record did not reflect any significant side effects. Tr. at 541. He denied considering the mental or psychological aspects of Plaintiff's functioning in assessing his RFC. Tr. at 543.

b.    Dr. Tollison

Medical Expert C. David Tollison, Ph. D. ("Dr. Tollison"), a clinical psychologist, testified at the hearing on September 9, 2014. Tr. at 544. He stated he considered Listings 12.04, 12.05, 12.06, and 12.07 in evaluating the medical evidence. Tr. at 548. He indicated the evidence from Drs. Thompson, Whitley, Desai, Loudermilk, and Burnette suggested Plaintiff had a diagnosis of major depressive disorder under the introductory criteria for Listing 12.04. Tr. at 549. He classified Plaintiff as having moderate limitation to activities of daily living ("ADLs"); marked limitation in maintaining social functioning; moderate limitation to concentration, persistence, or pace; and no episodes of decompensation. Tr. at 550. He stated Dr. Desai suggested Plaintiff's anxiety met the introductory criteria under Listing 12.06, but that a review of the entirety of the evidence refuted a diagnosis of anxiety under Listing 12.06. Tr. at 549–50. He noted that Dr. Whitley's and Dr. Thompson's findings suggested Plaintiff met the paragraph A criteria under Listing 12.07. Tr. at 550. He assessed Plaintiff as having marked limitation in ADLs; marked difficulties in maintaining social functioning; moderate difficulties in

maintaining concentration, persistence, or pace; and no episodes of decompensation. Tr. at 551. Dr. Tollison clarified that he found Plaintiff's impairment met the requirements for a finding of disability under Listing 12.07 during the relevant period. *Id.* He explained that he found Plaintiff to have marked limitation to social functioning based on his testimony and his report to Dr. Thompson of social withdrawal. Tr. at 552–53. He clarified that he found Plaintiff to have moderate limitation to ADLs under Listing 12.04, but marked limitation to ADLs under Listing 12.07 based on the additional consideration of Plaintiff's pain and psychological problems. Tr. at 553. He discussed Plaintiff's IQ scores under Listing 12.05, but concluded Plaintiff's IQ fell in the borderline range. Tr. at 556. He concluded Plaintiff's impairments did not meet the requirements in paragraphs C and D of Listing 12.05. Tr. at 557.

The ALJ asked Dr. Tollison to specify Plaintiff's functional limitations as they related to Listing 12.04. Tr. at 557. Dr. Tollison stated Plaintiff would need to avoid or to have minimal interaction with others; could maintain concentration for no more than two to two-and-a-half hours at a time without breaks; should avoid complex tasks and instructions; and would be limited to two or three step tasks. Tr. at 557–58. The ALJ next asked Dr. Tollison to consider Plaintiff's functional limitations under Listing 12.07. Tr. at 558. Dr. Tollison specified that the same limitations would apply, but that Plaintiff would be unable to maintain persistence, concentration, pace, and focus for more than 45 minutes to an hour at a time. Tr. at 558–59.

2.    The ALJ's Findings

In his decision dated February 13, 2015, the ALJ made the following findings of

fact and conclusions of law:

1.    The claimant last met the insured status requirements of the Social Security
Act on December 31, 2014.

2.    The claimant did not engage in substantial gainful activity during the period
from his alleged onset date of February 16, 2009 through February 1, 2013,
the current established/awarded onset date (20 CFR 404.1571 *et seq.*).

3.    From February 16, 2009 to February 1, 2013, the claimant had the
following severe combination of impairments: cervical and lumbar
degenerative disc disease; obesity; pain disorder; adjustment disorder with
major depressive features without psychotic features; anxiety; [sic] (20
CFR 404.1520(c)).

4.    From February 16, 2009 to February 1, 2013, the claimant did not have an
impairment or combination of impairments that met or medically equaled
the severity of one of the listed impairments in 20 CFR Part 404, Subpart P,
Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, I find that, from February
16, 2009 to February 1, 2013, the claimant had the residual functional
capacity to perform sedentary work as defined in 20 CFR 404.1567(a)
except for the following limitations: occasionally lift/carry up to 10 pounds
from tabletop/thigh level only; frequently lift/carry less than 10 pounds
(examples: file folders and small tools) from tabletop/thigh level only;
stand/walk up from 2 to 4 hours in an 8-hour workday and sit for 4 to 6
hours in an 8-hour workday (totaling 8 hours); all performed with normal
breaks which are allowed. The claimant is allowed to exercise a sit/stand
option consistent with the exertional limitations; in doing so, he cannot be
off-task more (defined as above and beyond normal breaks, but it does not
actually contemplate that the claimant is away from the workstation; in fact,
he cannot be away from the workstation) than 5% of the work period; takes
into consideration the time that [it] takes a person to switch from sitting to
standing and vice versa (where he is still attending to task); equates to 3
minutes per hour cumulatively (not necessarily at one time). The claimant
can sit at any one time in a 45 to 60 minute time segment; can stand at any
one time in a 30 minute time segment; and can walk at any one time in a 20
to 30 minute time segment. The claimant's use of his upper extremities to
perform push/pull operations limited to prior exertional limitations, but they
are not further limited regarded frequency. The claimant's use (push/pull)
of lower extremities to operate foot controls is limited as follows: can
occasionally operate foot controls up to 20 pounds, frequently operate foot

controls up to 10 pounds on the right; and never operate foot controls of 20 pounds, occasionally operate foot controls with less than 10 pounds, frequently operate foot controls of 10 pounds on the left[.] *[However, the VE testified that he looked at jobs with no use of foot controls]*. The claimant cannot climb ladder/rope/scaffolds; occasionally climb ramp/stairs; frequently balance (is limited to jobs which can be performed with a hand-held assistive device, which is required only for uneven terrain or prolonged ambulation, defined as walking up to 1 hour). The workstation can be used to assist with balancing, if necessary), occasionally stoop; cannot crouch; occasionally kneel and crawl. The claimant should avoid even moderate exposure to excessive vibration, and should avoid all exposure to hazards (example of hazards: use of moving machinery, exposure to unprotected heights). The claimant's work that can be done limited to the performance of simple, repetitive, and routine tasks in a work environment free of fast-paced production requirements. The work can involve only simple, work-related decisions. There should be few, if any, changes in the workplace and should be introduced on a gradual basis. There can only be minimal interaction with the general public, defined as 0 to 6% of the time. The claimant can be around coworkers throughout the day, with occasional interaction with his coworkers. *[However, the VE testified that he looked at jobs "that essentially avoid people"]*.

6.    From February 16, 2009 to February 1, 2013, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.    The claimant was born on June 3, 1966 and was 42 years old, which is defined as a younger individual age 18–44, on the alleged onset date. The claimant subsequently changed age category to a younger individual age 45–49 (20 CFR 404.1563).

8.    The claimant has a limited education and is able to communicate in English (20 CFR 404.1564)[.]

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    From February 16, 2009 to February 1, 2013, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11.    The claimant was not under a disability, as defined in the Social Security Act, at any time from February 16, 2009, the alleged onset date, through February 1, 2013, the current established/awarded onset date (20 CFR 404.1520(g)).

Tr. at 388–435.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ did not adequately consider whether Plaintiff's impairment met or medically-equaled the requirements for a finding of disability under Listing 12.05;

2)    the ALJ did not adequately weigh the medical opinions of record;

3)    the ALJ did not appropriately evaluate whether Plaintiff's impairments were disabling under Listing 12.07;

4)    the ALJ did not assess Plaintiff's mental impairments, limited intelligence, and limited academic abilities as severe impairments;

5)    the ALJ selectively isolated evidence that was unfavorable to Plaintiff and failed to consider the entire record; and

6)    the ALJ did not pose adequate hypothetical questions to the VE.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

34

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[5] (4) whether such impairment prevents claimant from performing PRW;[6] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can

---

[5] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[6] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

## 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the

Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Listing 12.05

Plaintiff argues the ALJ erred in determining that his impairments did not meet the requirements for a finding of disability under paragraphs C and D of Listing 12.05. [ECF No. 15 at 35]. He maintains he had verbal, performance, and full scale IQ scores of 67; a

history of special education; and significant physical and mental impairments that caused significant work-related restrictions. *Id.* at 36.

The Commissioner argues the ALJ found that Plaintiff did not have a valid verbal, performance, or full scale IQ of 60 through 70, which is a requirement to meet paragraphs C and D of Listing 12.05. [ECF No. 17 at 15–16]. She further maintains Plaintiff did not have deficits in adaptive functioning that were initially manifested during the developmental period—another requirement to meet Listing 12.05. *Id.* at 17–18.

An ALJ "must fully analyze whether a claimant's impairment meets or equals a 'Listing' where there is factual support that a listing could be met." *Huntington v. Apfel*, 101 F. Supp. 2d 384, 390 (D. Md. 2000), citing *Cook v. Heckler*, 783 F.2d 1168, 1172 (4th Cir. 1986) (remanded, in part, because of ALJ's failure to specifically identify relevant Listing and compare each of the Listed criteria to the evidence of the claimant's symptoms). "The ALJ's analysis must reflect a comparison of the symptoms, signs, and laboratory findings concerning the impairment, including any resulting functional limitations, with the corresponding criteria set forth in the relevant listing." *Id.* "In order to meet a Listing, every element of the listing must be satisfied." *Id., citing Sullivan v. Zebley*, 493 U.S 521, 531 (1990).

To establish disability under Listing 12.05, an individual must show significantly subaverage general intellectual functioning with deficits in adaptive functioning that initially manifested before age 22 and meet the severity requirements in either paragraph A, B, C, or D. 20 C.F.R., Pt. 404, Subpt. P, App'x. 1, § 12.05. In *Hancock v. Astrue*, 667 F.3d 470, 473 (4th Cir. 2012)*, the court explained that an individual must prove two

elements to satisfy the requirements in the introductory paragraph to the Listing—"deficits in adaptive functioning generally" and a "deficiency" that "manifested itself before the age of 22."

"Deficits in adaptive functioning can include limitations in areas such as communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." *Jackson v. Astrue*, 467 F. App'x 214, 218 (4th Cir. 2012), citing *Atkins*, 536 U.S. at 309 n.3. The Supreme Court has held that intellectual disability is characterized by "significant limitations" in at least two of the areas of adaptive functioning in conjunction with significantly subaverage general intellectual functioning. *Atkins*, 536 U.S. at 309 n.3. In *Weedon v. Astrue*, No. 0:11-2971-DCN-PJG, 2013 WL 1315311, at *5–6 (D.S.C. Jan. 31, 2013), *adopted by* 2013 WL 1315206 (D.S.C. Mar. 28, 2013), this court identified the following factors that courts interpreting Listing 12.05 have deemed important for ALJs to consider in determining whether an individual has deficits in adaptive functioning: the individual's actual IQ score; the individual's diagnosis; whether the individual is illiterate; whether the individual has ever lived independently; whether the individual has ever provided care for others or whether he is dependent on others for care; school records and past academic performance; work history; and the tasks the individual is able to undertake.

To establish disability under paragraph C of Listing 12.05, the individual must have "'a valid verbal, performance, or full scale IQ of 60 through 70' ('Prong 2'), as well as 'a physical or other mental impairment imposing an additional and significant work-

related limitation of function' ('Prong 3')." *Hancock*, 667 F.3d at 473; 20 C.F.R., Pt. 404, Subpart P, App'x 1, § 12.05C.  "Once it is established that the claimant's IQ falls within the range required by § 12.05C, the inquiry is whether the claimant suffers from any additional physical or mental impairment significantly limiting work-related functions." *Kennedy v. Heckler*, 739 F.2d 168, 172 (4th Cir. 1984); 20 C.F.R., Pt. 404, Subpart. P, App'x 1, § 12.05C.

To meet the requirements for a finding of disability under paragraph D, the individual must have a valid verbal, performance, or full scale IQ of 60 through 70 that results in at least two of the following:

1.    Marked restriction of ADLs;

2.    Marked difficulties in maintaining social functioning;

3.    Marked difficulties in maintaining concentration, persistence, or pace; or

4.    Repeated episodes of decompensation, each of extended duration.

20 C.F.R., Pt. 404, Subpart P, App'x 1, § 12.05D.

The ALJ reasonably concluded that Plaintiff had no deficits in adaptive functioning that initially manifested during the developmental period based his school records, his work history, and his demonstrated abilities in 11 skill areas. *See* Tr. at 396–400. The ALJ found the record did not support Plaintiff's allegation that he attended special education classes. Tr. at 397. His assessment was consistent with Plaintiff's academic record that failed to reference "special education" and showed he was enrolled in "Basic English" and "Practical Math"; repeated English II in summer school; and

earned Bs, Cs, Ds, and Fs in his courses. Tr. at 860. The ALJ noted that Plaintiff had an extensive work history as a machine operator and a carpenter for a number of years with the same company. Tr. at 398. This finding was consistent with Plaintiff's reported work history and the vocational testimony. Tr. at 50–57, 153–60, 567–87, 621–23, and 635–44. The ALJ considered each of the 11 skill areas of adaptive functioning and explained his reasons for finding that Plaintiff had no significant problems in any of these areas. Tr. at 398–400. He found Plaintiff had mild, but not significant, deficits in communication and social skills based on Dr. Thompson's July 2011 observations of his speech and communication. Tr. at 398–99. He found Plaintiff to have no significant limitations in self-care, home living, and leisure because he could care for his personal needs, perform household chores, and shop for groceries. Tr. at 399. He determined Plaintiff had no significant limitation to use of community resources and health issues because he had sought continued treatment from various providers. *Id.* He found no significant limitations to self-direction based on Plaintiff's ability to complete day-to-day tasks without guidance. *Id.* The ALJ concluded the record indicated no significant limitation in functional academic skills based on Plaintiff's school record. *Id.* He stated Plaintiff's work history indicated he had no significant limitations to work. *Id.* Finally, he found that Plaintiff had no significant limitations to safety because he had not presented evidence to suggest he was unable to recognize dangerous situations. *Id.*

The ALJ also cited sufficient evidence to support his conclusion that Plaintiff did not have a valid verbal, performance, or full scale IQ score of 60 through 70. *See* Tr. at 397–98. He found that the verbal IQ of 67, performance IQ of 73, and full scale IQ of 67

that Dr. Thompson assessed in July 2011 were influenced by Plaintiff's pain and underrepresented his actual abilities. *Id.* He noted that Dr. Whitley assessed a verbal IQ score of 74, a perceptual reasoning score of 81, a working memory score of 74, a processing speed score of 79, and a full scale IQ score of 72 in July 2014 and indicated the scores were a mild underestimation of Plaintiff's true functioning abilities, but were representative of his pain-related difficulties. Tr. at 397–98. He noted that Dr. Tollison reviewed the assessed IQ scores and the psychologist's impressions and found that Plaintiff had borderline intellectual functioning. Tr. at 398.

Because the ALJ found that Plaintiff had no deficits in adaptive functioning and did not have a valid verbal, performance, or full scale IQ score of 60 through 70, his conclusion that Plaintiff's impairments did not meet the requirements in paragraphs C and D of Listing 12.05 is supported by substantial evidence.

### 2.    Medical Opinions

Plaintiff argues the ALJ did not adequately consider the medical opinions of record. [ECF No. 15 at 37, 39–40, 43]. He maintains the ALJ erred in declining to accord great weight to his treating physicians' opinions. *Id.* at 39–40. He contends Dr. Tollison's testimony was consistent with and based on the treating and examining physicians' opinions and observations. *Id.* at 37; ECF No. 18 at 1–2. He argues the opinions of Drs. Loudermilk, Tollison, and Desai were consistent with and supported by those of the consultative psychologists and physician. *Id.* at 40 and 43, 45–46.

The argues the ALJ cited sufficient evidence to support the weight he accorded to the opinions of Drs. Loudermilk, Desai, Thompson, and Whitley. [ECF No. 17 at 22–25].

She maintains the ALJ was not required to adopt Dr. Tollison's opinion that Plaintiff met Listing 12.07 because it was an opinion on an issue reserved to the Commissioner; was internally inconsistent; and was based on Plaintiff's testimony. *Id.* at 20.

ALJs must consider all medical opinions in the record. 20 C.F.R. § 404.1527(b). If a treating physician provides a medical opinion, that opinion is entitled to deference and may be entitled to controlling weight if it is well-supported by medically-acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence of record. *Morgan v. Barnhart*, 142 F. App'x 716, 727 (4th Cir. 2005); 20 C.F.R. § 404.1527(c)(2). However, if a treating physician declines to provide a medical opinion or if the ALJ does not accord controlling weight to a treating physician's opinion, the ALJ must weigh all opinion evidence based on (1) the examining relationship between the claimant and the medical provider; (2) the treatment relationship between the claimant and the medical provider, including the length of the treatment relationship and the frequency of treatment and the nature and extent of the treatment relationship; (3) the supportability of the medical provider's opinion in his or her own treatment records; (4) the consistency of the medical opinion with other evidence in the record; and (5) the specialization of the medical provider offering the opinion. *Johnson*, 434 F.3d at 654; 20 C.F.R. § 404.1527(c).

ALJs are guided in weighing the medical opinions of record by the provisions of 20 C.F.R. § 404.1527. A treating source's opinion generally carries more weight than any other opinion evidence of record, even if it is not well-supported by medically-acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial

evidence in the case record. 20 C.F.R. § 404.1527(c)(2). However, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001), citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). Pursuant to 20 C.F.R. § 404.1527(c)(3), ALJs should give more weight to medical opinions that are adequately explained by the medical providers and supported by medical signs and laboratory findings than to unsupported and unexplained opinions. "The medical source opinion regulations indicate that the more consistent an opinion is with the record as a whole, the more weight the Commissioner will give it." *Stanley v. Barnhart*, 116 F. App'x 427, 429 (4th Cir. 2004), citing 20 C.F.R. § 416.927(d) (2004).[7] In addition, ALJ's are directed to give greater weight to opinions from specialists who address medical issues related to their areas of specialty than to opinions from physicians regarding conditions outside their areas of specialty. 20 C.F.R. § 404.1527(c)(5). ALJs should also consider any additional factors that tend to support or contradict medical opinions in the record. 20 C.F.R. § 404.1527(c)(6).

The ALJ must give good reasons for the weight he accords to the treating source's opinion. SSR 96-2p. The notice of decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the

---

[7] The version of 20 C.F.R. § 416.927 effective March 26, 2012, redesignated 20 C.F.R. § 416.927(d)(4) as 20 C.F.R. § 416.927(c)(4).

weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.*

It is not the role of this court to disturb the ALJ's determination as to the weight to be assigned to a medical source opinion "absent some indication that the ALJ has dredged up 'specious inconsistencies,' *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992), or has not given good reason for the weight afforded a particular opinion." *Craft v. Apfel*, 164 F.3d 624 (Table), 1998 WL 702296, at *2 (4th Cir. 1998) (per curiam).

In view of the relevant case law, the undersigned considers the ALJ's consideration of the medical opinions of record.[8]

### a.    Dr. Loudermilk's Opinions

Although Dr. Loudermilk had opined that Plaintiff was capable of returning to work in late-2009 (Tr. at 278) and early-2010 (Tr. at 274, 275, and 284), he subsequently provided statements that suggested Plaintiff's pain would negatively impact his ability to perform all work.

On February 16, 2011, Dr. Loudermilk completed a questionnaire titled "Clinical Assessment of Pain." Tr. at 322–323. He opined that Plaintiff's pain was present to such an extent to be distracting to adequate performance of daily activities or work. *Id.* He thought it was likely that physical activities such as walking, standing, bending, stooping, or moving of arms and legs would greatly increase Plaintiff's pain to such a degree that it would cause distraction from performing a task or even cause total abandonment of a

---

[8] The record contains opinions from acceptable medical sources and other medical sources in addition to those discussed below, but the undersigned has analyzed only those opinions Plaintiff alleges the ALJ erred in evaluating.

task. *Id.* He opined that medications prescribed or typically prescribed in cases like Plaintiff's could be expected to cause significant side effects which limited the effectiveness of work duties or the performance of such everyday tasks as driving an automobile. *Id.* Dr. Loudermilk also thought that Plaintiff's pain and/or medication side effects could be expected to be severe and to cause distraction, inattentiveness, and drowsiness. *Id.* He indicated that pain would remain a significant element in Plaintiff's life. *Id.*

On March 16, 2014, Dr. Loudermilk completed a second form entitled "Clinical Assessment of Pain." Tr. at 958–60. He set forth the same limitations in the earlier evaluation. Tr. at 958–59. He assessed Plaintiff's impairments to include chronic low back pain due to lumbar degenerative joint and disc disease and cervical spondylosis. *Id.* He cited the October 2013 cervical MRI and the February 2013 lumbar MRI as objective evidence that supported his diagnoses. Tr. at 960. Dr. Loudermilk indicated Plaintiff's limitations were normally expected from the type and severity of his diagnosis. *Id.* He noted Plaintiff had suffered from the limitations described in the questionnaire since September 2, 2009. *Id.* He assessed Plaintiff's complaints as credible and consistent with his diagnoses. *Id.* He confirmed that his opinions were based on objective findings gleaned from physical examinations and diagnostic testing, as well as Plaintiff's subjective complaints. *Id.*

In response to questions posed by Plaintiff's attorney in a letter dated June 5, 2014, Dr. Loudermilk indicated there was no objective evidence on his physical exam or on the 2010 FCE that supported his findings. Tr. at 973. He explained that the difference

46

between the functional capacity assessments he provided and Dr. Burnette's opinion were that he provided a clinical assessment of Plaintiff's pain and Dr. Burnette provide an impairment rating. *Id.* He noted that they were two different types of assessment. *Id.* He stated he did not perform FCEs and noted that they were typically performed by physical therapists. *Id.*

The ALJ noted that Dr. Loudermilk recorded no physical examination findings after August 2010 and stated "I find this very probative and diminishes the value of Dr. Loudermilk's notes and opinions because as the treating physician prescribing the claimant's pain medications, all throughout his treatment notes, he makes no record of more objective physical exam findings and only lists the claimant's complaints." Tr. at 404 and 417; *see also* Tr. at 419. He observed that in November 2009, Dr. Loudermilk had opined that Plaintiff was not disabled and needed to complete a work hardening program and return to work and that in February 2010, he also recommended Plaintiff return to gainful employment. Tr. at 419. He discussed normal examination findings in July and August 2009 and mild objective findings in September and October 2009. Tr. at 420.

The ALJ indicated he accorded controlling weight to Dr. Loudermilk's "February 2011 and March 2014 Clinical Assessments of Pain and his June 2014 explanation," but with certain "caveats." Tr. at 421. He explained those caveats as follows:

> Dr. Loudermilk previously and consistently stated that the claimant was able to "return to some type of gainful employment," which is wholly not inconsistent with the above RFC, which takes into consideration the claimant's alleged pain (to the degree it is supported by objective medical evidence, not based on his subjective complaints alone). Dr. Loudermilk

indicates that these 2 pain assessments are not inconsistent with his prior opinions or these other opinions. Dr. Loudermilk also noted that he assessed the claimant's pain, which as previously noted, is subjective. Finally, Dr. Loudermilk points out that his questionnaires do not state limitations in functional terms. I find that these 2 pain assessments are not consistent with SSRs 98-6p[9] and 00-4p in that they are based on underlying assumptions or definitions that are inconsistent with regulatory policies and definitions (See 20 CFR 404.1560). 20 CFR 404.1520a(c) articulates functional limitations, among other terms. The limitations and the degree of the limitation set forth in these questionnaires do not comport with these regulatory provisions. Nonetheless, I find that these assessments of pain are not inconsistent with the above decision, which has evaluated the claimant's alleged pain complaints, and found them not fully credible, at times inconsistent, and not fully supported by the objective evidence.

*Id.*

The undersigned recommends the court find the ALJ did not comply with the requirements of SSR 96-2p in evaluating and weighing Dr. Loudermilk's opinion statements. Although the ALJ purported to have accorded controlling weight to Dr. Loudermilk's February 2011, March 2014, and June 2014 opinions, he did not actually do so. As when the exception swallows the rule, the ALJ's "caveats" swallow the controlling weight he purported to give to Dr. Loudermilk's opinion. He found that Plaintiff was mentally capable of performing simple, repetitive, and routine tasks in a work environment free of fast-paced production requirements; that involved only simple, work-related decisions; that required few, if any, changes in the workplace that should be introduced on a gradual basis; and that required minimal interaction with the general public and only occasional interaction with coworkers. Tr. at 401. In concluding that the

---

[9] Because SSR 98-6p does not exist, the undersigned has reasoned that the ALJ reversed the numbers and meant to refer to SSR 96-8p, which addresses assessment of a claimant's RFC.

assessed RFC was consistent with Dr. Loudermilk's opinion, the ALJ ignored that Dr. Loudermilk opined Plaintiff's pain would distract him from adequately performing work; that an increase in physical activity would cause him to be distracted from or to abandon his tasks; and that medications would cause severe distraction, inattentiveness, and drowsiness. Tr. at 322–23 and 958–59.

The ALJ referenced 20 C.F.R. §§ 404.1560 and 404.1520a(c) and SSRs 96-8p and 00-4p in explaining his evaluation of Dr. Loudermilk's opinion. A review of 20 C.F.R. § 404.1560 and SSR 00-4p fails to reveal why the ALJ would have considered them in assessing Dr. Loudermilk's opinion. The undersigned notes that 20 C.F.R. § 404.1560 addresses when the agency will consider a claimant's vocational background and SSR 00-4p concerns occupational information and vocational expert evidence. In the absence of an explanation from the ALJ as to how Dr. Loudermilk's opinions "are based on underlying assumptions or definitions that are inconsistent with regulatory policies and definitions" (Tr. at 421) under § 404.1560 and SSR 00-4p, the undersigned can find no logical basis for his conclusions.

A review of 20 C.F.R. § 404.1520a(c) provides little support for the ALJ's conclusion that the limitations and degree of limitation set forth by Dr. Loudermilk did "not comport with" the "regulatory provisions" (Tr. at 421). Pursuant to 404.1520a(a), the special technique for evaluating mental impairments is to be used by the administrative adjudicator. Although 20 C.F.R. § 404.1520a(c) requires that ALJs consider the four broad functional areas of ADLs; social functioning; concentration, persistence, or pace; and episodes of decompensation and assess them based on degree of

limitation ranging from none to extreme, the regulation also provides that ALJs should make their assessments "based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis" and should consider "the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function." 20 C.F.R. § 404.1520a(c)(2). The specific limitations outlined by Dr. Loudermilk were relevant to the ALJ's assessment of Plaintiff's degree of limitation in the four broad functional areas, but Dr. Loudermilk's assessment of specific limitations, as opposed to degrees of limitation, did not prevent the ALJ from extrapolating Plaintiff's degree of limitation.

Pursuant to SSR 96-8p, if the ALJ proceeds to steps four and five of the evaluation process, he must offer a more detailed assessment of the claimant's RFC than is provided by assessing the degree of functional limitation in the broad categories and must itemize various functions. Paragraph C of Listing 12.00 specifies that in considering ADLs, the ALJ should consider "adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office" and should "determine the extent to which you are capable of initiating and participating in activities independent of supervision or direction." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00(C)(1). "Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00(C)(1). "Social functioning in work situations may

involve interactions with the public, responding appropriately to persons in authority (e.g., supervisors), or cooperative behaviors involving coworkers." *Id.* "Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00(C)(3). "Strengths and weaknesses in areas of concentration and attention can be discussed in terms of your ability to work at a consistent pace for acceptable periods of time and until a task is completed, and your ability to repeat sequences of action to achieve a goal or objective." *Id.*

In view of 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00(C)'s explanation as to specific functions within the categories of ADLs, social functioning, and concentration, persistence, or pace, the undersigned finds little support for the ALJ's determination that the limitations specified by Dr. Loudermilk did not comport with or were inconsistent with the factors to be considered under SSR 96-8p. Dr. Loudermilk addressed Plaintiff's abilities in the functional area of concentration, persistence, or pace. *See* Tr. at 322–23 and 958–59. He suggested Plaintiff's pain would affect his functioning in that it would be so distracting as to prevent him from completing work within time parameters, working until the task was completed, and meeting quality and accuracy standards. *See id.*

The ALJ's evaluation of Dr. Loudermilk's opinion also fails to account for two important factors under 20 C.F.R. § 404.1527(c) that provided support for the opinion. The ALJ indicated the probative value of Dr. Loudermilk's notes and opinions were diminished because he stopped recording physical examination findings after August

51

2010 (Tr. at 404, 417, 419, and 420), but he ignored that Dr. Loudermilk was a pain management specialist whose primary role was to offer treatment in response to Plaintiff's subjective reports of pain. He also failed to adequately consider that Dr. Loudermilk's opinion was consistent with the opinions of the other treating and examining physicians and the medical expert for the period after mid-2010. *Compare* Tr. at 322–23 and 958–59, *with* Tr. at 324–26, 342–44, 550–54, 557–59, 911–12, 965–69, and 979–83.

In light of the foregoing explanation, the undersigned recommends the court find the ALJ did not adequately evaluate and weigh Dr. Loudermilk's opinions in accordance with the provisions of 20 C.F.R. § 404.1527(c) and SSR 96-2p.

b.    Dr. Desai's Opinion

On March 17, 2011, Dr. Desai completed a mental RFC form. Tr. at 324–26. She assessed Plaintiff as having poor to no ability to deal with the public and function independently. *Id.* She stated his ability to relate to coworkers, interact with supervisors, deal with work stresses, and maintain attention and concentration were seriously limited, but not precluded. *Id.* Dr. Desai wrote that these limitations were the result of Plaintiff's depression, anxiousness, and inability to focus as a result of pain. *Id.* Additionally, Dr. Desai opined that Plaintiff's ability to understand, remember, and carry out complex or detailed job instructions was seriously limited because pain and high anxiety affected his concentration and ability to retain information. *Id.* She indicated Plaintiff was capable of managing benefits in his own best interest. *Id.*

52

On June 5, 2013, Dr. Desai indicated Plaintiff demonstrated obsessive thought content; a depressive and angry mood/affect; poor attention/concentration; and adequate memory. Tr. at 909. She indicated Plaintiff had serious work-related functional limitations. *Id.*

On March 27, 2014, Dr. Desai completed a mental RFC form. Tr. at 965–69. She stated Plaintiff's diagnoses included major depressive disorder, generalized anxiety disorder, and chronic back pain. Tr. at 965. She specified Plaintiff's signs and symptoms included poor memory, increased appetite, sleep disturbance, mood disturbance, emotional disturbance, recurrent panic attacks, anhedonia or pervasive loss of interest, psychomotor agitation, paranoia, difficulty concentrating, feelings of guilt/worthlessness, fleeting suicidal thoughts, decreased energy, generalized persistent anxiety, and irritability. Tr. at 965–66. She described Plaintiff as appearing depressed; having low and monotone speech; exhibiting somatization; being vaguely suicidal; and having poor concentration. Tr. at 966. She stated she prescribed 150 milligrams of Effexor and 100 milligrams of Desyrel to treat Plaintiff's symptoms. Tr. at 966. She indicated she had not tested Plaintiff's IQ, but believed he had a learning disability. *Id.* She estimated Plaintiff's impairments or treatment would cause him to be absent from work more than three times per month. *Id.* She opined that Plaintiff could not consistently meet the time requirements of a normal workweek on a sustained basis because he would be highly anxious, depressed, and in pain. Tr. at 967. Dr. Desai described Plaintiff as having marked restriction of ADLs; extreme difficulties in maintaining social functioning; moderate restrictions in his abilities to respond appropriately to supervisors, coworkers,

and the public; frequent deficiencies of concentration, persistence, or pace that would result in a failure to complete tasks in a timely manner; and continual episodes of deterioration or decompensation in a work or work-like setting that would cause him to withdraw or experience an exacerbation of symptoms. *Id.* She assessed the following abilities as markedly limited: to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; to sustain an ordinary routine without special supervision; to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; to maintain socially-appropriate behavior; to adhere to basic standards of neatness and cleanliness; to follow work rules; to use appropriate judgment; to cope with work stresses; to function independently; to relate predictably in social situations; to consistently demonstrate reliability; and to set realistic goals or make plans independently of others. Tr. at 968–69. She indicated Plaintiff had suffered from the limitations described in the questionnaire since September 2, 2009. Tr. at 969. Dr. Desai indicated in a second questionnaire that Plaintiff had poor abilities to deal with the public; function independently; understand, remember, and carry out complex job instructions; and demonstrate reliability. Tr. at 970–71. Dr. Desai described Plaintiff as being highly anxious, depressed, and unable to concentrate because of pain and anxiety. Tr. at 970. She noted Plaintiff was forgetful and had a learning disability. Tr. at 971. She indicated Plaintiff would not be dependable because of his pain issues and high anxiety level. *Id.*

The ALJ stated he did not give controlling weight to Dr. Desai's March 2011, June 2013, and March 2014 opinions, but he indicated he gave "significant weight to the portions of these opinions" that were consistent with the mental limitations he included in the assessed RFC. Tr. at 422. He stated he considered the factors in 20 C.F.R. § 404.1527 in evaluating Dr. Desai's opinion. Tr. at 422–23. He found that a gap in Plaintiff's treatment with Dr. Desai between November 2010 and February 2012 and the absence of objective mental exam findings were "probative" and diminished the value of Dr. Desai's notes and opinions. Tr. at 423. He determined Dr. Desai's opinion was not an adequate evaluation of Plaintiff's RFC because it did not use functional terms. *Id.* The ALJ found Dr. Desai's opinions to be "internally inconsistent" because she opined to moderate, marked, and extreme mental limitations, but indicated Plaintiff could manage benefits in his own best interest. *Id.* He indicated Dr. Desai's opinion was also flawed by the fact that she assessed Plaintiff's functioning during time periods in which she provided no treatment. *Id.* He found that Dr. Desai's opinions were not supported by the medical evidence of record, including her own treatment records and cited treatment notes from November 2011 and November 2012 that indicated Plaintiff was doing well on his medications and was mentally stable. *Id.* He also determined that Dr. Desai's opinions were inconsistent with the record as a whole and cited Plaintiff's reports of ADLs in October 2009, May 2010, and July 2011. Tr. at 423–24.

The ALJ cited sufficient reasons for declining to accord controlling weight to Dr. Desai's opinion. The record supports his findings that Dr. Desai did not conduct regular mental status examinations and that Plaintiff reported stable symptoms during some

visits. *See* Tr. at 914–25. Nevertheless, it does not appear the ALJ appropriately evaluated Dr. Desai's opinion under the provisions of SSR 96-2p and 20 C.F.R. § 404.1527(c).

The ALJ did not adequately consider the treatment relationship between Plaintiff and Dr. Desai. Although the ALJ correctly noted that Plaintiff first treated with Dr. Desai in October 2010, he incorrectly stated Plaintiff did not treat with Dr. Desai between November 2010 and February 2012. The record reflects treatment visits in October 2010, November 2010, December 2010, January 2011, March 2011, May 2011, June 2011, August 2011, November 2011, February 2012, May 2012, August 2012, November 2012, February 2013, May 2013, August 2013, November 2013, and February 2014. *See* Tr. at 914–25. It appears Plaintiff initially received treatment from Dr. Desai on a monthly basis, but later transitioned to treatment every three months. *See id.* Because the ALJ found that Plaintiff did not treat with Dr. Desai between November 2010 and February 2012, despite records to the contrary, it is impossible for the court to determine whether his assessment of the supportability of Dr. Desai's records was influenced by a failure to review some of those records. While the ALJ cited some evidence that suggested Plaintiff's mental status was stable and that he was tolerating his medications well, he ignored other evidence of exacerbations in Plaintiff's mental symptoms that were pertinent to evaluation of the relationship between Plaintiff's pain and his mental functioning. *See* Tr. at 917 (noting that Plaintiff indicated pain was "the major limiting factor" on August 13, 2012), 918 (observing that Plaintiff appeared quite sad and depressed on May 15, 2012), 919 (indicating Plaintiff reported excessive pain and an

inability to sleep on June 14, 2011), 920 (stating Plaintiff was "quite stressed" and was unable to sleep because of his pain on March 17, 2011, and indicated his pain totally dictated his life and prevented him from concentrating and enjoying things on May 3, 2011), 921 (noting Plaintiff complained of side effects from medications, anger, tiredness, irritability and difficulty sleeping and indicating he appeared "to be quite frustrated, depressed, and somatising [sic]" on January 19, 2011), 922 (indicating Plaintiff reported staying depressed and agitated on December 22, 2010), and 923 (noting Plaintiff complained of being aggravated "with just about everybody in general," having no friends, struggling with pain, and feeling "totally worn out and tired" on November 29, 2010).

The ALJ cited a perceived inconsistency between Dr. Desai's assessment of moderate, marked, and extreme limitation and her conclusion that Plaintiff could handle funds in his own best interest, but Listing 12.00(c) indicates a need to examine the nature and overall degree of interference with function in assessing the degree of functional limitation. *See* 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00(C)(3) ("[I]f you can complete many simple tasks, we may nevertheless find that you have a marked limitation in concentration, persistence, or pace if you cannot complete these tasks without extra supervision or assistance, or in accordance with quality and accuracy standards, or at a consistent pace without an unreasonable number and length of rest periods, or without undue interruptions or distractions."). Thus, a claimant's ability to perform one function within a broad functional area does not prove that he does not have a marked or extreme degree of functional limitation.

While the ALJ cited Dr. Desai's failure to include "functional terms" as a factor that weighed against her opinion, medical opinions cannot be disregarded because they fail to include functional terms. *See* 20 C.F.R. § 404.1527(a) (defining medical opinions as statements from acceptable medical sources "that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions"); *see also* 20 C.F.R. § 404.1527(b) (requiring ALJs to consider all medical opinions of record). Dr. Desai's opinion statements included an assessment of the degree of functional limitation imposed by Plaintiff's impairments, which was relevant to the ALJ's evaluation of his degree of functional limitation. *See* Tr. at 967. Dr. Desai also included restrictions to various functions that translated into functional terms. *See* Tr. at 966–71. She stated Plaintiff was likely to be absent from work on more than three days per month; would fail to complete tasks in a timely manner; would have difficulty getting along with peers and coworkers; would be unable to behave predictably in social situations; would have difficulty functioning independently; would have difficulty maintaining standards of neatness and cleanliness; and could not sustain an ordinary routine without special supervision. *See* Tr. at 967–71. These functional terms are particularly relevant to an assessment of a claimant's RFC under the provisions of SSR 96-8p and Listing 12.00(c).

It also appears that the ALJ failed to look at the record as a whole in determining that Dr. Desai's opinion was inconsistent. The ALJ cited only Plaintiff's reported ADLs to refute Dr. Desai's opinion and two of the reports he referenced were for the period before Plaintiff began treatment with Dr. Desai. *See* Tr. at 423–24. He failed to examine

the consistency between Dr. Desai's opinion and the observations and opinions of the other treating and examining physicians and psychologists and the medical expert. *Compare* Tr. at 324–26 and 965–69, *with* Tr. at 322–23, 342–44, 550–54, 557–59, 911–12, 958–59, and 979–83.

In light of the foregoing, the undersigned recommends the court find the ALJ did not adequately evaluate Dr. Desai's opinion in accordance with the provisions of SSR 96-2p and 20 C.F.R. § 404.1527(c).

c.     Dr. Tollison's Testimony

The ALJ discussed Dr. Tollison's testimony that Plaintiff's impairment met the requirements of Listing 12.07 based on Dr. Whitley's and Dr. Thompson's assessments of the paragraph A criteria and evidence of record that showed him to have marked impairments of ADLs; marked impairment of social functioning; moderate impairment of concentration, persistence, or pace; and no episodes of decompensation during the relevant time period. Tr. at 431. He noted that Dr. Tollison testified that Plaintiff's interpretation of his pain exceeded the hard physical evidence, but was consistent with a finding of disability under Listing 12.07 when considered in combination with the psychological evidence. *Id.* He recognized that Dr. Tollison assessed the following limitations under Listing 12.07: "ability to maintain concentration, persistence, pace, and focus to 45 minutes to 1 hour at a time, due to combination of pain and psychological factors"; "capable of simple, repetitive, and routine tasks"; and "would need minimal contact with the general public (0 to 6% of the time)." Tr. at 432. He stated he gave "less weight" to Dr. Tollison's opinion than to Dr. Schoscheim's opinion because he "admitted

that he based his opinion on the claimant's hearing testimony more so than the written record," which "was mostly regarding his current complaints and limitations" and was "subjective evidence" that "has been found to be only partially credible and given little weight." *Id.* He further stated Dr. Tollison's opinion was "internally inconsistent with and contradicts itself" because he gave RFC limitations that did not correspond with his findings regarding Plaintiff's level of impairment. *Id.* He also indicated he gave little weight to Dr. Tollison's opinion that Plaintiff met Listing 12.07(B) because it was not supported by the medical evidence of record and was inconsistent with the record as a whole. Tr. at 433.

The ALJ mischaracterized Dr. Tollison's testimony as to the basis of his opinion. Dr. Tollison specifically referenced the findings of Drs. Thompson, Whitley, Loudermilk, Burnette, and Desai in explaining the basis for his opinion. *See* Tr. at 549, 550, 551–52, 554. He indicated his finding that Plaintiff had marked difficulty in maintaining social functioning was "primarily" influenced by Plaintiff's testimony, but noted Dr. Thompson's records reflected social withdrawal, as well. Tr. at 552–53. Although the ALJ found that Dr. Tolllison's opinion was not supported by the medical evidence of record, he failed to explain his finding. Furthermore, Dr. Tollison's opinion is generally consistent with the observations and opinions of the treating and examining physicians. *Compare* Tr. at 550–54, 557–59, *with* Tr. at 322–23, 324–26, 342–44, 911–12, 958–59, 965–69, and 979–83. In light of the foregoing, the undersigned recommends the court find the ALJ did not adequately assess the opinion.

d.    Dr. Thompson's Opinions

On July 11, 2011, Dr. Thompson opined that Plaintiff could not possibly concentrate on simple repetitive types of tasks without being involved in a dangerous situation. Tr. at 341. He indicated Plaintiff would have extreme restrictions responding to work pressures and marked restrictions in his ability to interact appropriately with the public, supervisors, and coworkers in a usual work setting. Tr. at 342–44.

On July 17, 2013, Dr. Thompson indicated Plaintiff would be unable "to perceive or avoid danger in a typical work place" and had difficulty with emotional control." Tr. at 911. He determined Plaintiff was unable to manage benefits because of neurovegetative symptoms of major depression and poor attention and concentration. Tr. at 912. He stated Plaintiff could not "be trusted to work independently in a typical work environment without coming into contact with machinery or becoming at risk for another injury." *Id.*

The ALJ stated he gave "little weight overall" to Dr. Thompson's opinion "mainly because the claimant's complaints and behavior at the various State agency CEs showed elevated and perhaps exaggerated pain presentation that is not fully consistent with his ongoing, long-term presentation to treatment providers." Tr. at 427. He indicated he considered the factors in 20 C.F.R. § 404.1527 and noted that Dr. Thompson was an examining, but not a treating source. *Id.* He recognized that Plaintiff used a non-prescribed cane and wore a wrist splint and lumbar corset to three of the four consultative examinations, but that his treatment notes only reflected use of a cane on three occasions and use of a wrist splint on one occasion. *Id.* He also noted that Dr. Thompson described Plaintiff as having "over-the-top and exaggerated pain behaviors." *Id.* He further

61

indicated Dr. Thompson's opinion was "given little weight overall" because it was not supported by the medical evidence of record" or the "record as a whole." *Id.* He cited November 2011 and November 2012 treatment notes that indicated Plaintiff continued to do well on his medication and Plaintiff's October 2009, May 2010, and July 2012 reports of his ADLs. Tr. at 427–28. The ALJ indicated that because Dr. Thompson's July 2013 examination occurred after the established onset date determined in the second application, it had reduced relevance to the earlier period. Tr. at 426.

The undersigned recommends the court find the ALJ did not adequately consider Dr. Thompson's opinion in light of the other evidence of record. Records from Plaintiff's treating providers suggested that Plaintiff demonstrated significant pain-related behavior. *See* Tr. at 274 ("Mr. Malone is lying on a gurney rolling around in pain and says he knows there is something wrong with his lower back.") and 925 (noting Plaintiff made facial grimaces that suggested he was in pain, paced the floor, and appeared to be depressed and somaticizing). The records of the other treating and examining medical sources also reflect a connection between Plaintiff's pain and his psychological functioning. *See* Tr. at 317 (observing that Plaintiff's pain was coming from depression), 331 (stating there appeared to be a lot of emotional overlay with Plaintiff's pain), 552 (indicating that there is a psychological aspect to Plaintiff's pain because it exceeds the hard physical evidence), and 979 (diagnosing depressive disorder due to chronic back pain with depressive features). Finally, the opinions of the treating physicians, the other examining psychologist, and the medical expert are consistent with Dr. Thompson's opinion. *See* Tr. at 322–23, 324–26, 550–54, 557–59, 958–59, 965–69, and 979–83. In

light of the foregoing evidence, it appears the ALJ erred in assessing the consistency of Dr. Thompson's opinion with the record as a whole.

e.    Dr. Whitley's Opinion

On July 22, 2014, Dr. Whitley opined that Plaintiff had "the ability to understand and follow clearly defined 2 and 3-step work instructions," but would have difficulty "sustain[ing] focus and concentration for any length of time." Tr. at 979.  He indicated Plaintiff "would be vulnerable to decompensate easily dealing with sustained stress demands, changes and expectations during a typical workday at this time." *Id.* He stated Plaintiff "would require consistent rest breaks during a typical day." Tr. at 980. He indicated Plaintiff would be at least mildly impacted in his abilities to interact appropriately with coworkers and the public and to manage appointments and work schedules. *Id.*

Dr. Whitley completed a medical source statement regarding Plaintiff's ability to do work-related activities. Tr. at 981–83. He assessed Plaintiff's level of restriction as "marked" with respect to the following abilities: to understand and remember complex instructions; to carry out complex instructions; and to make judgments on complex work-related decisions. Tr. at 981. He identified moderate restriction with respect to Plaintiff's abilities to interact appropriately with the public, supervisors, and coworkers and to respond appropriately to usual work situations and to changes in a routine work setting. Tr. at 982. He stated Plaintiff would be unable to manage benefits in his own best interest. Tr. at 983.

The ALJ found that the relevance of Dr. Whitley's opinion was limited by the fact that it was based on an examination that occurred after Plaintiff's established onset date. Tr. at 427. He indicated he considered the factors in 20 C.F.R. § 404.1527 and noted that Dr. Whitley was an examining, but not a treating source. *Id.* He noted Plaintiff's "elevated and perhaps exaggerated pain presentation" during the examination, which he found to be inconsistent with his presentation to his treatment providers. *Id.* He found that Dr. Whitley's opinion was not supported by the medical evidence of record and was inconsistent with the record as a whole. Tr. at 427–28. However, he gave "great weight" to the portions of Dr. Whitley's opinion in which he assessed Plaintiff as having "the ability to understand and follow clearly defined 2 and 3-step work instructions as he has done so in the past" and indicated Plaintiff did not meet qualifications for mental retardation. Tr. at 428.

The undersigned recommends the court find the ALJ erred in considering the consistency factor under 20 C.F.R. § 404.1527(c). As discussed earlier, the record does not support the ALJ's finding that Plaintiff presented with more pain-related behavior during the consultative examinations than during visits with his treating physicians. The ALJ cited a function report from October 2009, notes from a May 2010 telephone conference, and some of Plaintiff's reported ADLs during his July 2011 exam with Dr. Rowland to support his finding that Plaintiff's ADLs were inconsistent with Dr. Whitley's assessment. *See* Tr. at 427–28. However, he ignored that these reports generally reflected a high degree of functional limitation. *See* Tr. at 161–66 (reciting ADLs that generally involved eating meals his wife prepared; lying around and watching

television; dressing and bathing with difficulty; and being unable to care for and play with his son), 130 (stating he was "taking nerve pills for anxiety and depression," experienced "crying spells that come from out of the blue," became upset easily, felt constant back pain, was able to perform light activities like washing dishes or "a little cooking," and could "walk around Walmart if he had to but most of the time he rides in the electric cart [b]ut can't sit in that for long either"), and 329 (reporting doing "zero housework and no dishes or laundry" and performing no yardwork; describing Plaintiff as "unhappy person and never smiles" and having communication skills that varied from poor to fair). Finally, Dr. Whitley's observations and opinion are generally consistent with those of Drs. Loudermilk, Desai, Tollison, and Thompson. *Compare* Tr. at 979–83, *with* Tr. at 322–23, 324–26, 342–44, 550–54, 557–59, 911–12, 958–59, and 965–69.

### 3. Listing 12.07

Plaintiff argues the ALJ erred in determining that his impairments did not meet the requirements for a finding of disability under Listing 12.07 because the medical records and opinion evidence supported a finding of disability under the Listing. [ECF No. 15 at 37, 39–40, 43]. The Commissioner maintains the ALJ reasonably found that Plaintiff's impairments did not meet the requirements for a finding of disability under Listing 12.07 because he did not have two areas of marked limitation (ADLs, social functioning, or concentration, persistence, or pace) or one area of marked limitation and repeated episodes of decompensation. [ECF No. 17 at 19].

Listing 12.07 addresses somatoform disorders, which involve "physical symptoms for which there are no demonstrable organic finding or known physiological

mechanism." 20 C.F.R., Pt. 404, Subpart P, App'x 1, § 12.07. To meet the severity requirement under the Listing, the individual must meet the criteria in parts A and B as detailed below:

A.    Medically documented by evidence of one of the following:

    1.    A history of multiple physical symptoms of several years duration, beginning before age 30, that have caused the individual to take medicine frequently, see a physician often and alter life patterns significantly;

    2.    A persistent nonorganic disturbance of one of the following:

        a.    Vision; or

        b.    Speech; or

        c.    Hearing; or

        d.    Use of a limb; or

        e.    Movement and its control (e.g., coordination disturbance, psychogenic seizures, akinesia, dyskinesia; or

        f.    Sensation (e.g., diminished or heightened).

    3.    Unrealistic interpretation of physical signs or sensations associated with the preoccupation or belief that one has as serious disease or injury;

AND

B.    Resulting in at least two of the following:

    1.    Marked restriction of ADLs; or

    2.    Marked difficulties in maintaining social functioning; or

    3.    Marked difficulties in maintaining concentration, persistence, or pace; or

4.    Repeated episodes of decompensation, each of extended duration.

*Id.*

Pursuant to paragraph C of Listing 12.00 (generally addressing mental impairments), "a marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R., Pt. 404, Subpart P, App'x 1, § 12.00(C). The Listing addresses marked ADLs as follows:

We do not define "marked" by a specific number of different activities of daily living in which functioning is impaired, but by the nature and overall degree of interference with function. For example, if you do a wide range of activities of daily living, we may still find that you have a marked limitation in your daily activities if you have serious difficulty performing them without direct supervision, or in a suitable manner, or on a consistent, useful, routine basis, or without undue interruptions or distractions.

20 C.F.R., Pt. 404, Subpart P, App'x 1, § 12.00(C)(1).

It states the following regarding marked difficulties in maintaining social functioning:

We do not define 'marked' by a specific number of different behaviors in which social functioning is impaired, but by the nature and overall degree of interference with function. For example, if you are highly antagonistic, uncooperative, or hostile but are tolerated by local storekeepers, we may nevertheless find that you have a marked limitation in social functioning because that behavior is not acceptable in other contexts.

20 C.F.R., Pt. 404, Subpart P, App'x 1, § 12.00(C)(2).

It addresses marked difficulties in maintaining concentration, persistence, or pace as follows:

> We do not define 'marked' by a specific number of tasks that you are unable to complete, but by the nature and overall degree of interference with function. You may be able to sustain attention and persist at simple tasks, but may still have difficulty with complicated tasks.
>
> Deficiencies that are apparent only in performing complex procedures or tasks would not satisfy the intent of this paragraph B criterion. However, if you can complete many simple tasks, we may nevertheless find that you have a marked limitation in concentration, persistence, or pace if you cannot complete these tasks without extra supervision or assistance, or in accordance with quality and accuracy standards, or at a consistent pace without an unreasonable number and length of rest periods, or without undue interruptions or distractions.

20 C.F.R., Pt. 404, Subpart P, App'x 1, § 12.00(C)(3).

The ALJ found that Plaintiff had moderate restriction of ADLs. Tr. at 392. He cited Plaintiff's reports that he fed and cleaned his dog, washed dishes, cooked, and went to Walmart; an October 2009 notation in his medical record that his "other ADLs" were intact; a December 2010 recommendation that he engage in mild exercise and activity as tolerated; his testimony during the June 2011 hearing that he cared for his personal needs and engaged in ADLs that included walking around, watching television, and sitting on the porch; and his reports to the consultative examiner in July 2011 that he lived with his wife and two children, used the microwave, did no household chores, drove alone, appeared responsible to handle money, and attended church on a regular basis. *Id.* He discussed evidence after February 1, 2013, including Plaintiff's reports to Dr. Thompson in July 2013, his testimony during the May 2014 hearing, his reports to Dr. Whitley in July 2014, and his testimony during the September 2014 hearing. Tr. at 392–93. Then, he

explained his finding that Plaintiff had only moderate restriction of ADLs from February 16, 2009, to February 1, 2013, as follows:

> In conclusion, I find that from February 16, 2009 to February 1, 2013, although the claimant described daily activities which were fairly limited, two factors weigh against considering these allegations to be strong evidence in favor of finding claimant disabled. First, allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty. Secondly, even if the claimant's activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of evidence for this application and appeal, rather than in a genuine attempt to obtain relief from the allegedly disabling symptoms.

Tr. at 393.

The ALJ also found Plaintiff had moderate difficulties in social functioning. *Id.* He noted that Dr. Desai's treatment notes between November 2010 and February 2014 failed to include mental status examinations. Tr. at 393. He noted that while Plaintiff reported to Dr. Thompson in July 2011 that he did not like going around crowds or seeing his friends, he attended church on a regular basis. *Id.* He indicated Dr. Thompson described Plaintiff as presenting with a dysphoric, histrionic, and irritable mood; being quite anxious; reporting being "tired"; speaking with coherent speech and a normal flow; having poor stress coping skills; being quite frustrated and irritated; and having an extremely concrete thought process. Tr. at 393. He observed that Dr. Rowland described Plaintiff as being unhappy, never smiling, and having fair to poor communication skills. *Id.* He discussed evidence after February 1, 2013, but determined that because that evidence concerned Plaintiff's mental state at that time, as opposed to prior to February 1, 2013, it did not relate back to the prior time period. Tr. at 393–94.

The ALJ concluded Plaintiff had moderate difficulties in maintaining concentration, persistence, or pace. Tr. at 394. He cited an October 2009 function report in which Plaintiff indicated he did not need special reminders to care for his personal needs or take medications. *Id.* He again noted that Dr. Desai's examination notes contained no mental examinations. *Id.* He recounted Dr. Thompson's impressions from his July 2011 examination, including his indications that Plaintiff had coherent speech that was of normal flow; that his concentration was poor because of a high preoccupation with pain and somaticizing complaints; that he had made an extremely poor psychological adjustment to his current physical pain and problems; that his insight and judgment appeared to be poor; that his thought process was very concrete; that he was easily distracted; that his cognitive processing was extremely delayed; and that his IQ scores were far below expectations. *Id.* The ALJ discussed the evidence regarding Plaintiff's concentration, persistence, and pace after February 2013, but found that the subsequent evidence did not relate back to the relevant time period. Tr. at 395.

The ALJ concluded that because Plaintiff's mental impairments did not cause "at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of extended duration, the 'paragraph B' criteria" were not met. *Id.*

Relevant to consideration under Listing 12.07, the treating and examining physicians found Plaintiff's interpretation of his physical symptoms to be an unrealistic interpretation of his physical signs or sensations and to be influenced by his emotional problems. Although the ALJ acknowledged and gave great weight to Dr. Rowland's opinion "that there appeared to be 'a lot of emotional overlay with [the claimant's] pain'"

70

(Tr. at 428), he did not acknowledge the consistency between this statement and the observations of the treating and examining medical providers. *See* Tr. at 317 (noting that a lot of Plaintiff's pain was coming from his depression), 911 (indicating that Plaintiff had "made a very poor psychological adjustment to his pain and current difficulties), 925 (observing Plaintiff to make facial grimaces that indicated he was in pain and to be depressed and somaticizing), 973 (explaining that diagnostic testing did not support the assessed level of impairment), and 979 (diagnosing depressive disorder due to chronic back pain with depressive features). The ALJ also ignored Dr. Tollison's explanation for his finding that Plaintiff met the criteria for a finding of disability under Listing 12.07. *See* Tr. at 550 (explaining that Plaintiff's examinations with Drs. Thompson and Whitley supported a finding that his impairment met the paragraph A criteria under Listing 12.07), 551–54 (providing a basis for his determination that Plaintiff had marked restriction of ADLs, marked difficulties in maintaining social functioning, and moderate limitations to concentration, persistence, or pace), and 558–59 (indicating Plaintiff would only be able to maintain attention and concentration for 45 minutes to one hour at a time).

While the ALJ acknowledged that Plaintiff's reported ADLs "were fairly limited," he cited insufficient reasons for rejecting them. First, he concluded that he could not accept Plaintiff's reported activities because his "allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty." Tr. at 393. Assessments of a claimant's ADLs are based on the claimant's reports to his medical providers, his testimony, and the statements of his medical providers and the lay witnesses. *See* 20 C.F.R., Pt. 404, Subpart P, App'x 1, § 12.00(B); *see also* SSR 96-7p. In years of

71

reviewing Social Security disability cases, the undersigned has come across no case in which the plaintiff's ADLs could be "objectively verified with any reasonable degree of certainty," other than during periods of hospitalization. Thus, the ALJ's reasoning would only allow for a finding of marked limitation to ADLs for claimants who were institutionalized.

Second, the ALJ discounted Plaintiff's allegations because he found that the degree of limitation Plaintiff alleged could not be explained by his efforts to obtain relief from symptoms of his medical condition, as opposed to his effort to bolster his claim for benefits. *Id.* If the degree of limitation could be explained by the objective findings, the case would not fall under Listing 12.07. *See* 20 C.F.R., Pt. 404, Subpart P, App'x 1, § 12.07(A). The ALJ's rationale would never allow for a finding that an individual had marked limitation of ADLs under Listing 12.07. All claimants are potentially motivated by a desire to "bolster" their claims for benefits, but this potential motivation does not excuse the ALJ's obligation to examine a claimant's efforts to obtain relief from symptoms in evaluating the degree of functional limitation imposed by his impairment.

The ALJ did not adequately explain his determination that Plaintiff had moderate, as opposed to marked, difficulties in maintaining social functioning. Although he recited observations from several medical providers that suggested a greater degree of limitation, he referenced only Plaintiff's report of attending church to refute the providers' observations. *See* Tr. at 393–94. He disregarded opinion evidence of record that addressed Plaintiff's difficulties in maintaining social functioning. *See* Tr. at 324–26 (assessing poor to no ability to deal with the public and function independently and

seriously limited abilities to relate to coworkers, interact with supervisors, and deal with work stresses), 341 (indicating Plaintiff could not focus on simple, repetitive tasks without possibly causing harm to himself or his coworkers), 343 (assessing marked limitations in Plaintiff's ability to interact appropriately with the public, coworkers, and supervisors), 552–53 (explaining finding of marked limitation to social functioning), 911–12 (stating Plaintiff would demonstrate problems with emotional control in a work environment and would be unable to work independently), 967 (indicating Plaintiff would have extreme difficulties in maintaining social functioning and moderate restrictions in his abilities to respond appropriately to supervisors, coworkers, and the public), 968–69 (assessing markedly limited abilities to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; to maintain socially-appropriate behavior; to adhere to basic standards of neatness and cleanliness; to function independently; and to relate predictably in social situations), 970–71 (stating Plaintiff had poor abilities to deal with the public and to function independently), and 982 (assessing moderate restriction with respect to Plaintiff's abilities to interact appropriately with the public, supervisors, and coworkers and to respond appropriately to usual work situations and to changes in a routine work setting). While this evidence does not irrefutably weigh in favor of a finding that Plaintiff had marked limitations in social functioning, the ALJ was required to consider it in assessing Plaintiff's degree of functional limitation.

Finally, the ALJ cited insubstantial evidence to support his finding that Plaintiff had moderate, as opposed to marked or extreme, limitations to concentration, persistence, or pace. His decision fails to acknowledge the consistency between the medical opinions

of record regarding the degree of impairment to this functional area. *See* 322–23 (stating Plaintiff's pain would be distracting to adequate performance of daily activities or work and that physical activities would greatly increase his pain to the point that he would be distracted from performing a task or would abandon the task), 341 (indicating Plaintiff could not possibly concentrate on simple, repetitive types of tasks without being involved in a dangerous situation), 342 (assessing marked impairment in Plaintiff's abilities to understand and carry out detailed instructions and extreme limitations in his ability to make judgments on  simple work-related decisions), 912 (indicating Plaintiff could not work independently or manage benefits because of neurovegetative symptoms of major depression and poor attention and concentration), 966 (estimating Plaintiff would be absent from work more than three times per month because of his impairments or treatment), 967 (indicating deficiencies of concentration, persistence, or pace would frequently result in failure to complete tasks in a timely manner), 968 (assessing markedly limited abilities to maintain attention and concentration for extended periods; perform activities within a schedule; and complete a normal workday and workweek without interruptions from psychologically-based symptoms), 979 (stating Plaintiff would have difficulty "sustain[ing] focus and concentration for any length of time" and "would be vulnerable to decompensate easily"), and 980 (indicating Plaintiff would require consistent rest breaks and would be unable to manage benefits in his own best interest).

In light of the foregoing, substantial evidence does not support the ALJ's determination that Plaintiff's impairments failed to meet the requirements for a finding of disability under Listing 12.07.[10]

### 4.    Additional Allegations of Error

Some of Plaintiff's allegations regarding the ALJ's consideration of the entire record have been addressed as part of the above analysis. However, the undersigned declines to address Plaintiff's additional allegations of error with specificity in light of the above recommendations.

### 5.    Reversal and Award of Benefits

Plaintiff requests the court reverse the Commissioner's final decision and award him benefits for the period from February 16, 2009, through January 31, 2013. [ECF No. 15 at 47]. The Fourth Circuit has explained that reversal, as opposed to remand for further administrative action, is appropriate under sentence four of Section 405(g), under the following circumstances: "where the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard," "when reopening the record for more evidence would serve no purpose," and "where a claimant has presented clear and convincing evidence that he is entitled to benefits." *Goodwine v. Colvin*, No. 3:12-2107-DCN, 2014 WL 692913, at *8 (D.S.C. Feb. 21, 2014), *citing*

---

[10] The undersigned does not recommend the court find that Plaintiff's impairment met the requirements of Listing 12.07. Although the evidence strongly suggests Plaintiff had marked limitation to concentration, persistence, or pace during the relevant period, it is less persuasive as to whether he had moderate or marked restriction of ADLs and social functioning. This recommendation should only be construed as a finding that the ALJ cited insufficient reasons to support his conclusion with respect to Listing 12.07.

*Breeden v. Weinberger*, 493 F.3d 1002, 1012 (4th Cir. 1974); *Veeney ex rel. Strother v. Sulllivan*, 973 F.3d 326, 333 (4th Cir. 1992).

Having determined that the record does not contain substantial evidence to support the ALJ's decision denying coverage under the correct legal standard, the undersigned turns to whether reopening the record for more evidence would serve any useful purpose. This case has a protracted legal history that includes Plaintiff's appearances before two ALJs for three separate hearings and two filings in this court. In addition, Plaintiff has presented for four consultative examinations at the agency's expense and the agency has solicited the services of two medical experts and two vocational experts in its efforts to resolve this case. Neither party has raised an issue regarding the completeness of the record. Thus, it is unlikely that reopening the record for additional evidence would be beneficial.

Nevertheless, the record contains some conflicting evidence as to when Plaintiff's impairments became disabling. Although Drs. Loudermilk, Desai, and Tollison have explicitly indicated their opinions related back to Plaintiff's alleged onset date, the ALJ correctly noted in his decision that Dr. Desai did not treat Plaintiff until October 2010 and that Dr. Loudermilk suggested Plaintiff was capable of returning to work prior to May 2010. *See* Tr. at 419–20 and 423. The record reflects that Dr. Whitehead released Plaintiff to return to work on May 4, 2009 (Tr. at 210), and Plaintiff testified that he performed light duty work until September 2009 (Tr. at 467–68). In light of this evidence, Plaintiff has not presented clear and convincing evidence that he was entitled to benefits as of his alleged onset date of February 16, 2009. Therefore, the undersigned recommends the

court remand the case to the Commissioner for a determination of Plaintiff's disability onset date.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

Shiva V. Hodges

October 4, 2016                                    Shiva V. Hodges
Columbia, South Carolina                    United States Magistrate Judge

**The parties are directed to note the important information in the attached**
**"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).